Joseph A. CARSANARO, Samir Abed, Aaron Seib, Aldo Kiamtia, and Barry Taylor, Plaintiffs,

v.

BLOODHOUND TECHNOLOGIES, INC., Gary G. Twigg, Patrick E. Kennedy, Noro–Moseley Partners V, L.P., Noro–Moseley Partners V–B, L.P., Moseley and Company V, LLC, Allen S. Moseley, Wakefield Group III, LLC, George M. Mackie, IV, David Gilroy, Michael Elliot, The North Carolina Bioscience Investment Fund, L.L.C., Eno River Capital, L.L.C., Daniel Egger, Michael Moran, William F. Chastain, Jr., Ron G. Roma, and Kevin R. Brown, Defendants.

C.A. No. 7301–VCL.

Court of Chancery of Delaware.

Submitted: Dec. 18, 2012.

Decided: March 15, 2013.

Sidney S. Liebesman, Montgomery, McCracken, Walker & Rhoads, LLP, Wilmington, Delaware; James A. Roberts, III, Brooke N. Albert, Lewis & Roberts, PLLC, Raleigh, North Carolina; Gary V. Mauney, Lewis & Roberts, PLLC, Charlotte, North Carolina; Attorneys for Plaintiffs.

Raymond J. DiCamillo, John D. Hendershot, Nicole C. Bright, Kevin M. Gallagher, A. Jacob Werrett, Richards, Layton & Finger, P.A., Wilmington, Delaware; Attorneys for Defendants Bloodhound Technologies Inc., Gary G. Twigg, Patrick E. Kennedy, Noro–Moseley Partners V, L.P., Noro–Moseley Partners V–B, L.P., Moseley and Company V, LLC, Allen S. Moseley, Wakefield Group III, LLC, George M. Mackie, IV, David Gilroy, Michael Elliot, Daniel Egger, Michael Moran, William F. Chastain, Jr., Ron G. Roma, and Kevin R. Brown.

## OPINION

LASTER, Vice Chancellor.

Bloodhound Technologies, Inc. ("Bloodhound" or the "Company") created web-

based software applications that allowed healthcare providers to monitor claims for fraud. The plaintiffs are five software developers, including Bloodhound's founder, who contend that their years of hard work laid the foundation for the Company's success. All held common stock. They claim that after Bloodhound raised its initial rounds of venture capital financing, the venture capitalists obtained control of the Company's board of directors. From that point on, they say, the venture capitalists financed the company through self-interested and highly dilutive stock issuances. The plaintiffs did not learn of the issuances or their consequences until late April 2011, when Bloodhound was sold for total consideration of $82.5 million. At that point, the plaintiffs discovered that their overall equity ownership had been diluted to under 1%. After members of management received transaction bonuses of $15 million and the preferred stockholders received nearly $60 million in liquidation preferences, the plaintiffs were left collectively with less than $36,000.

In this action, the plaintiffs challenge the dilutive transactions, the allocation of $15 million in merger proceeds to management, and the fairness of the merger. The plaintiffs have sued the members of the board who approved the transactions and their affiliated funds. The defendants have moved to dismiss on a wide range of theories. With limited exceptions, the motions to dismiss are denied.

## I. FACTUAL BACKGROUND

The facts for purposes of the motions to dismiss are drawn from the verified complaint and the documents it incorporates by reference. At this stage of the case, the allegations of the complaint are assumed to be true, and the plaintiffs are given the benefit of all reasonable inferences.

## A. The Early Days Of Bloodhound

In 1996, plaintiff Joseph A. Carsanaro saw a business opportunity in the growing use of the internet for submitting and processing healthcare claims. Carsanaro envisioned software that could monitor web-based claims in real time, detecting fraud, abuse, and errors before claims were paid. Carsanaro spent much of 1996 and 1997 identifying, integrating, and testing the core technologies that would form the basis for web-based applications. In July 1997, Carsanaro added plaintiffs Aldo Kiamtia, Barry Taylor, and David Whipple to his software development team.

In April 1998, Carsanaro formed Bloodhound to carry out his vision. Carsanaro served as CEO and Chairman of the Board, managed Bloodhound's day-to-day operations, and developed its business and financial plans. Kiamtia served as a member of the board and oversaw the software development process. Carsanaro initially financed Bloodhound with money raised from friends and family.

## B. The Series A Financing

In the third quarter of 1999, Bloodhound released its first web-based application. At this point, Bloodhound sought venture capital funding, and Carsanaro traveled to a series of investor conferences and spoke to numerous venture capital firms. His efforts paid off, and Bloodhound successfully raised $1.9 million. The lead investor was defendant North Carolina Bioscience Fund, LLC ("NC Bioscience"), a fund managed by defendant Eno River Capital LLC ("Eno Capital") and its principal, defendant Daniel Egger. Bloodhound issued 4,054,953 shares of Series A Preferred Stock, representing 44.42% of the fully diluted equity, at a price of $0.47 per share (the "Series A Financing"). According to

the complaint, the terms implied a $3 million pre-money valuation for the Company.

Bloodhound used the proceeds from the Series A Financing to expand its operations. In 2000, Carsanaro hired plaintiff Samir Abed to serve as Chief Technology Officer and plaintiff Aaron Seib to work as a Product Manager and Senior Director of Software Operations. In this capacity, Seib managed three software development teams. Abed joined the board.

Together Carsanaro, Kiamtia, Taylor, Seib, and Abed worked to develop a suite of web-based claims management applications that would provide a comprehensive range of overpayment protection services. Bloodhound closed sales agreements with more than two dozen customers, including large industry leaders, and its software suite began processing over one million claims nightly. In light of their collective efforts to create Bloodhound's products and get the Company off the ground, Carsanaro, Kiamtia, Taylor, Seib, and Abed refer to themselves collectively as the "Founding Team."

## C. The Series B Financing

In early 2000, Bloodhound sought additional venture capital funding. Carsanaro made presentations around the country to approximately 23 venture capitalist firms. His efforts again were successful, and Bloodhound raised $3.1 million. The lead investor was defendant Wakefield Group III, LLC (the "Wakefield Fund"). Bloodhound issued 4,306,324 shares of Series B Preferred Stock, representing 30.12% of the fully diluted equity, at a price of $0.72 per share (the "Series B Financing"). The terms implied a pre-money valuation for the Company of $8 million.

The complaint does not attack the Series A Financing or the Series B Financing. The complaint details Carsanaro's wide-ranging efforts and arm's length negotia-tions with third party capital providers for contrast with the defendants' later decisions to provide additional financing themselves on terms they set unilaterally.

## D. The Venture Capitalist Takeover

As of June 2000, the Bloodhound board of directors had five members: plaintiffs Carsanaro and Abed from the Founding Team; defendant Mike Moran, an outside director recruited by Carsanaro; defendant Egger from Eno Capital; and defendant David Gilroy, Vice President and General Partner of the Wakefield Fund. From this point on, the complaint weaves a tale in which the venture capitalists maneuvered to gain control of the board, then used self-interested financing transactions to position themselves to reap the vast majority of the Company's value at the expense of the Founding Team.

The venture capitalists' first move was to ease Carsanaro out of the top spot. According to the complaint, the venture capitalists convinced the board that "hiring a CEO with additional Healthcare domain experience would make [Bloodhound] more marketable to potential acquirers." Compl. ¶ 54. Carsanaro agreed with the plan, but only because he expected to remain Chairman and President.

The next step was to bring in another like-minded venture capitalist. To this end, the venture capitalists convinced the board that Bloodhound should raise "one last round of financing for the Company, in the form of a new round of Series C convertible preferred stock." Compl. ¶ 54. Carsanaro, Egger, and Gilroy reached out to Allen S. Moseley, the principal in an eponymously named venture capital firm, and began discussing a potential investment of $8–10 million. They eventually worked out terms on which Moseley-affili-ated funds would purchase shares of Ser-

ies C Preferred Stock representing a 28.57% fully diluted ownership interest in the Company at a price of $1.11 per share. The terms implied a pre-money valuation for the Company of $20–25 million.

In August 2000, the board hired William F. Chastain, a veteran healthcare executive, as Bloodhound's new CEO. The size of the board was increased from five to six, and Chastain joined as a director. After taking over as CEO, Chastain replaced Carsanaro in the discussions with Moseley. Egger, Gilroy, and Chastain then reopened the terms of the Series C Preferred. Carsanaro and Abed were excluded and not kept informed.

In October 2000, at Chastain's request, the size of the board was increased again, and Ron G. Roma became a director. The complaint alleges that Roma was an ally of Chastain but does not provide any facts to support this contention. I assume that Roma was an independent, disinterested director.

In December 2000, "[t]o his surprise," Carsanaro was asked by the board "to resign as a director, officer, and employee of the Company, effective December 20, 2000." Compl. ¶ 62. Contrary to his understanding, Carsanaro was not kept on as Chairman, President, or in any other capacity. "Abed had not been privy to any discussions concerning Carsanaro's forced resignation and was upset by the situation." Id. ¶ 63. Abed was then asked to resign from the board, although he would continue as Chief Technology Officer. Both men acceded to the resignation requests, accepting the claims of the venture capitalists that they were "industry specialists who were vastly more experienced than Plaintiffs in growing and building start-up healthcare IT companies like [Bloodhound]." Id. ¶ 72.

As of January 2001, Chastain, Roma, Gilroy, Egger, and Moran comprised the board. The directors approved a Series C financing round, but on different terms than those negotiated when Carsanaro was involved in the discussions. Under the original terms, only the Moseley-affiliated entities would have participated, they would have paid $1.11 per share of Series C Preferred, and they would have received shares representing 28.57% of the fully diluted equity. Under the new terms, Gilroy's fund (the Wakefield Fund) and Egger's fund (NC Bioscience) also participated, and Bloodhound issued 11,000,000 shares of Series C Preferred for $0.60 per share, which represented 39.79% of the fully diluted equity (the "Series C Financing"). In contrast to the original terms, which implied a pre-money valuation for the Company of $20–25 million, the new terms implied a pre-money valuation of $10 million.

To the extent the Wakefield Fund and NC Bioscience were able to maintain their equity stake by participating, the dilution from the down round was suffered principally by the common stock. The Founding Team was "never apprised of the final terms of the Series C Financing or of their fully diluted ownership interests in the Company. . . ." Compl. ¶ 71. The Founding Team presently believes that the issuance of the Series C Preferred left them with "approximately 9% of the Company." Id.

The Series C Financing closed on February 12, 2001. The Moseley funds that purchased Series C Preferred were defendants Noro–Moseley Partners V, LP and Noro–Moseley Partners V–B, LP (together, the "Noro–Moseley Funds"). Moseley managed the Noro–Moseley Funds in his capacity as a member of defendant Moseley & Company V, LLC ("Moseley & Co."), the general partner of both Noro–Moseley Funds. Three other entities affiliated with the Noro–Moseley Funds also

participated. After the Series C financing, Moseley joined the board.

### E. The Series D Financing

According to the minutes of a meeting held on September 19, 2001, the board scheduled a special telephonic meeting for October 1, 2001 to "conclude" the terms of a Series D financing. Compl. ¶ 78. The complaint observes that the use of "conclude" is odd, because none of the minutes of meetings earlier in the year reflect any discussions about a Series D round, its proposed terms, or a need to raise capital.

In October 2001, defendants Gilroy, Egger, Moseley, Chastain, Roma, and Moran comprised the board (the "Series D Board"). All six directors participated in the telephonic meeting. After some discussion of terms, Moseley asked for a temporary adjournment so that the directors representing the holders of the Series A, B, and C Preferred could discuss the financing "off-line." Compl. Ex. C. The meeting was adjourned at 4:45 p.m. and reconvened at 5:00 p.m. The directors then approved the sale of 5,903,253 shares of Series D Preferred Stock at a price of $0.7496 per share, which represented 16.87% of the fully diluted equity (the "Series D Financing"). The terms implied a pre-money valuation for the Company of $22 million.

Members of the board or their affiliated funds purchased the overwhelming majority of the Series D Preferred (5,877,426 out of the 5,903,253 shares issued):

- Gilroy personally purchased 33,351 shares;
- Gilroy's fund, the Wakefield Fund, purchased 633,725 shares;
- George M. Mackie, then a principal of the Wakefield Fund, personally purchased 7,631 shares;

- Moseley's funds and their affiliates purchased 4,975,986 shares;
- Egger's fund, NC Bioscience, purchased 226,733 shares.

Unlike previous rounds, when Bloodhound approached dozens of previously unaffiliated investors to obtain competitive financing terms, the Series D Board set the terms of the financing unilaterally. They did not contact outside investors or determine whether more favorable terms were available to the Company.

At the same time the directors approved the Series D Preferred, they issued 3,018,740 shares of common stock to management, representing a collective 14% post-financing ownership interest in the Company, at a price of $0.1875 per share. Chastain received 1,160,283 shares of restricted stock. Bloodhound loaned Chastain and the management team the funds required to purchase the stock.

### F. The Series E Financing

In July 2002, the directors decided to proceed with another financing. Rather than contacting third parties or canvassing the market, the directors negotiated with themselves. In September 2002, the Noro–Moseley Funds proposed to purchase up to 30,000,000 shares of Series E Preferred Stock for $0.10 per share, representing 14.2% of the fully diluted equity (the "Series E Financing"). The terms implied a pre-money valuation for the Company of $19 million. Among other terms, the Series E Preferred would carry a liquidation preference equal to three times its issue price.

The members of the board at the time were Moseley, Egger, Gilroy, and Moran, plus two new directors: Gary G. Twigg and George Mackie (collectively, the "Series E Board"). Twigg was the Company's CEO, having replaced Chastain at some unidentified time after the Series D Fi-

632

nancing. Mackie was a partner with the Wakefield Fund and invested personally in the Series D Preferred. He currently works for Moseley's firm.

The Series E Board approved the terms proposed by the Noro–Moseley Funds. The only change was one of form rather than substance. In lieu of having the Noro–Moseley Funds purchase 30,000,000 shares of Series E Preferred at $0.10 per share, the final transaction called for the Noro–Moseley Funds to purchase 3,000,-000 shares of Series E Preferred at $1.00 per share. To keep the conversion rights of the Series E Preferred equivalent, Bloodhound would engage in a 10–for–1 reverse split of its outstanding common stock (the "Reverse Split"). Bloodhound then would file an amended and restated charter authorizing the Series E Preferred (the "Series E Charter").

Bloodhound filed the certificate of amendment effecting the Reverse Split, then filed the Series E Charter shortly thereafter. *But the Series E Charter did not adjust the conversion prices of the Series A, B, or C Preferred to account for the Reverse Split.* Compl. Ex. L. By keeping the conversion prices constant, the Series E Charter made those shares' conversion rights ten times more valuable. Because the failure to adjust the conversion prices would dilute not only the common stock but also the Series D and E Preferred, Bloodhound entered into separate agreements with the holders of Series D and E Preferred to issue them additional shares. Compl. ¶¶ 121–125. The dilution from the failure to adjust the conversion prices fell squarely on the common stock.

The failure to adjust the conversion prices was contrary to the board resolutions that authorized the Series E Financing. That resolution stated:

[I]n connection with the [Reverse Split] ... the respective conversion prices of the issued and outstanding shares of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock and Series D Preferred Stock of the Company (collectively, "Preferred Stock") shall be proportionately adjusted in accordance with the terms of the Amended and Restated Certificate of Incorporation.

Compl. Ex. R.

The Series E Board made contemporaneous equity grants to management. The post-Reverse Split management equity pool was increased from 746,489 shares of common stock to 3,416,982 shares, representing 15% of the fully diluted equity. The Series E Board allocated one-third of the available shares (5% of the fully diluted equity) to Twigg and one-fifteenth of the available shares (1% of the fully diluted equity) to Mackie.

All but 60,325 shares of Series E Preferred were purchased by members of the Series E Board or their affiliates.

- Gilroy personally purchased 4,326 shares;
- Mackie personally purchased 6,394 shares;
- Gilroy and Mackie's fund, the Wakefield Fund, purchased 718,541 shares;
- Moseley's funds and their affiliates purchased 1,902,576 shares;
- Egger's fund, NC Bioscience, purchased 150,000 shares.

### G. Stockholder Approval For The Reverse Split

The Reverse Split required the approval of a majority of the common stockholders voting as a separate class. To supply the required vote, Abed and three other members of Bloodhound management (Michael

Ansel, Keith Zalewski, and David Whipple) were asked to execute written consents. Ansel, Zalewski, and Whipple were employees who would receive management equity grants as part of the Series E Financing. Abed had agreed to resign from the Company with a retroactive effective date of September 30, 2002. In November, he was still negotiating the terms of his departure. He held a total of 556,543 shares of restricted common stock, all but 20,000 of which had been purchased under Bloodhound's management equity plan using a note issued by the Company (the "Note Shares"). He could return the 536,543 Note Shares and cancel the note, or he could keep the Note Shares and pay off the note. The balance on the note was "substantial." Compl. ¶ 148.

The Note Shares represented approximately 13.49% of the outstanding common stock. As long as Abed held those shares, then Abed, Ansel, Zalewski, and Whipple could act by written consent to approve the Reverse Split. If Abed cancelled the note and tendered the Note Shares, then Bloodhound only could secure approval by soliciting other members of the Founding Team.

On November 4, 2002, Bloodhound CFO Dave Neal emailed Abed and proposed that he wait until January 2, 2003, to decide whether to pay off the note or return the Note Shares. Not realizing it mattered for the Reverse Split, Abed agreed.

On November 12, 2002, at 12:56 p.m., *less than four hours* before filing the amendment giving effect to the Reverse Split, Neal emailed the written consent to Abed for the first time. The amended certificates were supposed to be attached to the consent as exhibits, but Neal did not provide the attachments.

At 2:37 p.m. on November 12, 2002, Abed replied to Neal's email, stating "I've reviewed the document and while I have no problem signing the document in principle, I would very much appreciate getting [the exhibits] so I can understand the full scope of what I am signing. . . ." Compl. Ex. T. Abed further stated, "I am ready to sign this document as soon as I've had a chance to review the above mentioned exhibits and resolutions." *Id.*

Abed then recalled Neal telling him earlier in the week that executing the written consent was essential and an urgent matter for the Company. He began to fear that his delay might jeopardize the financing and cause the Company to take a harder line in its negotiations with him. Without receiving any additional information, Abed signed and emailed back the written consent to Neal at 3:01 p.m.

It was not until the next day, after the Series E Financing closed, that Neal told Abed he would provide him with the exhibits to the written consent. Neal did not send them until over a month later, on December 31, 2002, the same day that the Company repurchased the Note Shares and cancelled the note.

Bloodhound's other common stockholders were not given notice of the Series E Financing. Although Bloodhound printed new common stock certificates reflecting the Reverse Split, the certificates were not mailed to the common stockholders.

**H. Follow–On Series E Rounds**

Between November 2002 and April 2006, Bloodhound's financial performance improved steadily, with annual revenue increasing from $2,058,116 in 2002 to $5,475,458 in 2006. Despite the upward trajectory, the Board approved four more issuances of Series E Preferred *on the same terms established in November 2002.* At some point not described in the complaint, directors Patrick E. Kennedy and Kevin R. Brown joined the board and ap-

proved certain of the additional issuances. I assume that Kennedy and Brown are disinterested, independent directors.

The complaint identifies the following additional issuances of Series E Preferred:

- On June 23, 2003, Moseley, Gilroy, Twigg, Kennedy, and Brown approved the issuance of 701,787 shares;
- On November 4, 2003, Moseley, Gilroy, Twigg, Kennedy, and Brown approved the issuance of 701,787 shares;
- On August 31, 2004, Moseley, Gilroy, Twigg, Kennedy, and Brown approved the issuance of 2,198,976 shares;
- On April 7, 2006, Moseley, Gilroy, Twigg, and Kennedy approved the issuance of 1,000,000 shares.

Each time, a majority of the shares was purchased by the directors and their affiliates.

### I. Bloodhound Is Sold.

On April 27, 2011, Verisk Health Inc. ("Verisk") acquired Bloodhound for $82.5 million in total consideration (the "Merger"). Moseley, Twigg, Kennedy, and Michael Elliot, a Wakefield Fund partner, comprised the board at the time of the Merger. The directors contemporaneously approved a management incentive plan (the "MIP") granting management awards totaling $15 million, representing 18.87% of the merger consideration. Under the plan, $7,500,972 went to Twigg and $375,048 to Kennedy. Another $58,431,245 went to the preferred stockholders for their liquidation preferences. This left $4,573,824 to be divided *pro rata* among all stockholders, including the former holders of preferred stock on a post-conversion basis. Because of the failure to adjust the preferred stock conversion prices in connection with the Reverse Split, the com-

mon stock (excluding the as-converted preferred) received only $99,625.

The Founding Team received the following allocations of merger proceeds:

| | |
|---|---|
| Carsanaro | $29,266 |
| Kiamtia | $4,967 |
| Taylor | $993 |
| Abed | $397 |
| Seib | $99 |

The defendants received the following allocations of merger proceeds, including the management incentive plan:

| | |
|---|---|
| Noro–Moseley Funds | $27,032,666 |
| Wakefield Fund | $13,684,810 |
| NC Bioscience | $2,095,275 |
| Mackie | $119,681 |
| Gilroy | $92,143 |
| Egger | $43,639 |
| Twigg | $8,409,448 |
| Kennedy | $375,048 |

### J. The Founding Team Sues.

The Founding Team learned of the Merger in late April 2011. They were shocked to discover, for the first time, that the aggregate ownership interest of *all* common stockholders, on an as-converted basis, had been diluted to 2.18% and that the Founding Team collectively held less than 1%. They perfected their appraisal rights and, after obtaining documents, filed the current action.

## II. LEGAL ANALYSIS

The defendants have moved to dismiss the complaint. Certain defendants argue that they are not subject to jurisdiction. All of the defendants argue that the complaint fails to state a claim against them. The defendants also have raised various defenses.

## A. Personal Jurisdiction Over The Fund Defendants

■ The Noro–Moseley Funds and the Wakefield Fund (together, the "Fund Defendants") argue that this Court lacks personal jurisdiction over them. The Fund Defendants are not Delaware entities and do not have operations in Delaware. Determining whether a Delaware court can exercise jurisdiction over a nonresident defendant requires a two-step analysis. "First, the court must determine whether Delaware's long arm statute, 10 *Del. C.* § 3104(c), is applicable. If so, the court must decide whether subjecting the nonresident defendant to jurisdiction would violate due process." *Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023, 1027 (Del. 2012).

■ Section 3104(c) of the Delaware Long–Arm Statute states:

As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:

(1) Transacts any business or performs any character of work or service in the State;

10 *Del. C.* § 3104(c). "[A] single transaction is sufficient to confer jurisdiction where the claim is based on that transaction." *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 978 (Del.Ch.2000) (internal quotation marks omitted). Making a corporate filing with the Secretary of State constitutes the transaction of business within Delaware for purposes of Section 3104(c)(1). *See Matthew*, 56 A.3d at 1027–28; *Sample v. Morgan*, 935 A.2d 1046, 1057 (Del.Ch.2007).

■ Each of the transactions challenged in the complaint required one or more corporate filings with the Secretary of State, satisfying the requirement of an act within Delaware. The complaint pleads that Gilroy acted as the Wakefield Fund's representative on the board and as its agent for purposes of Section 3104(c)(1). Gilroy joined the board immediately after and (one can infer) because of Wakefield's substantial investment in the Series B Financing. Minutes of board meetings refer to him as "David Gilroy of the Wakefield Group." Compl. Ex. B., C. Gilroy signed the Series D Preferred Stock Purchase Agreement for the Wakefield Fund in his capacity as "Vice President." Compl. Ex. E. He signed the Series E Preferred Stock Purchase Agreement for the Wakefield Fund in his capacity as "Partner." Compl. Ex. O.

The complaint likewise pleads that Moseley acted as the representative of the Noro–Moseley Funds and Moseley & Co. and as their agent for purposes of Section 3104(c)(1). Moseley joined the board immediately after and (one can infer) because of Moseley's substantial investment in the Series C Financing. Minutes of board meetings refer to him as "Allen Moseley of Noro–Moseley Partners." Compl. Ex. B. He signed the stock purchase agreements for the Series D and E Financings in his capacity as a "Member" of Moseley & Co., the "General Partner" of both Noro–Moseley Funds. Compl. Ex. E., O.

■ Having met the requirements of Section 3104(c), the complaint satisfies due process by properly invoking the conspiracy theory of jurisdiction. *See Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210, 225–27 (Del.1982). This theory "is based on the legal principle that one conspirator's acts are attributable to the other conspirators." *Matthew*, 56 A.3d at 1027. "[I]f the purposeful act or acts of one conspirator are of a nature and quality that would subject the actor to the jurisdiction of the court, all of the conspirators

are subject to the jurisdiction of the court." *Istituto Bancario*, 449 A.2d at 222.

■ The conspiracy theory is met if the plaintiff can show that

(1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.

*Id.* at 225. Although *Istituto Bancario* literally speaks in terms of a "conspiracy to defraud," the principle is not limited to that particular tort. *Hamilton P'rs v. Englard*, 11 A.3d 1180, 1197 (Del.Ch.2010). When considering the five elements, a court is "not necessarily limited in its analysis to those acts upon which service of process under Delaware's long arm statute is based." *Hercules Inc. v. Leu Trust & Banking (Bah.) Ltd.*, 611 A.2d 476, 482 (Del.1992).

■ The complaint alleges that Gilroy, Moseley, and Egger implemented a plan to secure the vast bulk of Bloodhound's value by issuing preferred stock to their funds on unfairly advantageous terms. The economic investment of the Company's then-current management team was protected by new grants of equity, placing the burden of the dilution on the preexisting common stockholders and expropriating value from them. The Fund Defendants participated in the conspiracy as the purchasers of the preferred stock, and knew of both the conspiracy and the filings in Delaware because Gilroy's and Moseley's knowledge is imputed to them. *See Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 794 A.2d

1211, 1230 (Del.Ch.2001), *rev'd on other grounds*, 817 A.2d 149 (Del.2002).

Given these allegations, the exercise of jurisdiction over the Fund Defendants is consistent with due process. Sophisticated investors should reasonably expect to face suit in Delaware when they place their employees or principals on the board of directors of a Delaware corporation, then allegedly use those representatives to channel benefits to themselves through self-dealing transactions that require acts in Delaware for their implementation. *See id.* Delaware has a substantial and legitimate interest in providing a forum for resolving claims that sophisticated investors obtained positions for their representatives as fiduciaries of a Delaware entity, then used the authority derived from those positions to enrich themselves. As such, the exercise of personal jurisdiction over the Fund Defendants is constitutionally permissible.

### B. Whether The Complaint States A Claim

All of the defendants argue that the complaint fails to state a claim on which relief can be granted. The pleading standards at the motion to dismiss stage "are minimal." *See Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del.2011). The court must "accept all well-pleaded factual allegations in the Complaint as true," "draw all reasonable inferences in favor of the plaintiff," and "deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof." *Id.*

#### 1. The Claims Relating To The Series D Financing

Count I states a claim against the Series D Board for breach of fiduciary duty in

approving the Series D Financing. Based on the allegations of the complaint, the defendants will bear the burden of proving that the Series D Financing was entirely fair.

The business judgment rule serves as Delaware's default standard of review and applies to the overwhelming majority of decisions that boards make, including innumerable decisions that are never litigated and could not legitimately be challenged. As famously framed by the Delaware Supreme Court in *Aronson v. Lewis,* the rule presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." 473 A.2d 805, 812 (Del. 1984).

Because the business judgment rule establishes a presumption in favor of the directors, a plaintiff only can proceed by alleging facts sufficient to overcome one of the elements of the rule. *See Solomon v. Armstrong,* 747 A.2d 1098, 1111–12 (Del.Ch.1999) ("[u]nder the business judgment rule, the burden of pleading and proof is on the party challenging the decision. . . ." (footnote omitted)), *aff'd,* 746 A.2d 277 (Del.2000). To overcome the presumption of loyalty, a stockholder plaintiff must allege facts supporting a reasonable inference that there were not enough independent and disinterested individuals among the directors making the decision to comprise a board majority. *See Aronson,* 473 A.2d at 812 (noting that if "the transaction is not approved by a majority consisting of the disinterested directors, then the business judgment rule has no application whatever"). "Where actual self-interest is present and affects a majority of the directors approving a transaction, a court will apply . . . exacting scrutiny to determine whether the transaction is entirely fair to the stockholders." *Paramount Commc'ns Inc. v. QVC Network Inc.,* 637 A.2d 34, 42 n. 9 (Del.1994). "A board that is evenly divided between conflicted and non-conflicted members is not considered independent and disinterested." *Gentile v. Rossette,* 2010 WL 2171613, at *7 n. 36 (Del.Ch. May 28, 2010); *see Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart,* 845 A.2d 1040, 1046 n. 8 (Del.2004) (noting for demand futility purposes that a board evenly divided between interested and disinterested directors could not exercise business judgment on a demand); *Beneville v. York,* 769 A.2d 80, 85 (Del.Ch.2000) (same).

"[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 361 (Del.1993). As explained in the seminal loyalty case of *Guth v. Loft, Inc.,*

[c]orporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. While technically not trustees, they stand in a fiduciary relation to the corporation and its stockholders. A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its

powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest. The occasions for the determination of honesty, good faith and loyal conduct are many and varied, and no hard and fast rule can be formulated. The standard of loyalty is measured by no fixed scale.

5 A.2d 503, 510 (Del.1939). "Classic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally." *Cede*, 634 A.2d at 362; *see Marciano v. Nakash*, 535 A.2d 400, 404 (Del.1987) (applying entire fairness standard where interested directors provided debt financing to corporation); *cf. Rosenberg v. Oolie*, 1989 WL 122084, *4–5 (Del. Ch. Oct. 16, 1989) (assuming that entire fairness standard applied where interested directors provided financing to corporation through a bridge loan with warrant coverage).

■ Directors Gilroy, Egger, Moseley, Chastain, Roma, and Moran comprised the Series D Board. In the Series D Financing, funds affiliated with Gilroy, Egger, and Moseley purchased shares. The defendants have approached the case as if Gilroy, Egger, and Moseley were appointed by their respective funds but had no other affiliations with them. In other words, they analogize Gilroy, Egger, and Moseley to the independent directors who were appointed by the controlling stockholder in *Aronson*, but who served only as directors of the controlled corporation, received no compensation for their service other than in their role as directors, and did not owe fiduciary duties to the controller in any other capacity. *See Aronson*, 473 A.2d at 815–16.

■ The current case is not analogous to *Aronson* but rather involves the dual-fiduciary problem that *Weinberger v. UOP, Inc.* identified. *See Weinberger*, 457 A.2d 701 (Del.1983) (holding that officers of parent corporation faced conflict of interest when acting as subsidiary directors regarding transaction with parent); *accord Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.*, 532 A.2d 1324, 1336 (Del.Ch.1987) (same); *see also In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *8 (Del.Ch. July 24, 2009) (treating directors as interested for pleading purposes in transaction that benefited preferred stockholders when "each had an ownership or employment relationship with an entity that owned Trados preferred stock"). The complaint adequately alleges that Gilroy, Eggers, and Moseley are fiduciaries for their affiliated funds. "There is no dilution of [fiduciary] obligation where one holds dual or multiple directorships" or otherwise confronts the conflicting pull of competing fiduciary roles. *Weinberger*, 457 A.2d at 710. "There is no 'safe harbor' for such divided loyalties in Delaware." *Id.* Because of their dual status as fiduciaries for the Company and for the entities purchasing the Series D Preferred, Gilroy, Eggers, and Moseley were not independent with respect to the Series D Financing.

The complaint also pleads that Chastain was interested in the Series D Financing, because in conjunction with the issuance of the Series D Preferred, the Series D Board issued 1,160,283 shares to Chastain. This caused Chastain to have a personal interest in the Series D Financing that was not shared by the stockholders as a whole. *See e.g., In re Nat'l Auto. Credit, Inc. S'holders Litig.*, 2003 WL 139768, at *9 (Del.Ch. Jan. 10, 2003) ("[I]t is a reasonable inference from the particularized facts of the Complaint that the Resolutions were

adopted as a *quid pro quo,* and, as they amount to a single plan furthering the individual interests of the Defendant Directors, they are to be considered together . . . .").

The business judgment rule is rebutted with respect to the Series D Financing because only two of the six members of the Series D Board (Roma and Moran) were disinterested and independent. The complaint's allegations about the unilateral setting of the terms of the Series D Financing, without any market canvass or third party input, give rise to a reasonable inference of unfairness.

### 2. The Claims Relating To The Series E Financing

Count III states a claim against the Series E Board for breach of fiduciary duty in approving the initial Series E Financing and issuing additional tranches of Series E Preferred. Count V states a claim that in connection with the Series E Financing, Bloodhound violated Section 242 of the Delaware General Corporation Law (the "DGCL"). 8 *Del. C.* § 242.

#### a. The Initial Series E Financing—Entire Fairness

Count III alleges that the Series E Board breached its fiduciary duties in approving the initial Series E Financing. The fiduciary principles outlined in connection with the Series D Financing govern the initial Series E Financing. Based on the allegations of the complaint, the defendants on the Series E Board must prove that the Series E Financing was entirely fair.

Moseley, Egger, Gilroy, Moran, Mackie, and Twigg comprised the Series E Board. In the Series E Financing, funds affiliated with Gilroy, Mackie, Moseley, and Egger purchased shares. Each of these defendants acted as a fiduciary for his affiliated fund, creating divided loyalties giving rise to a conflict of interest. *See Weinberger,* 457 A.2d at 710. Twigg and Mackie were interested in the transaction because the Series E Board contemporaneously allocated options to Twigg and Mackie, respectively, equal to 5% and 1% of the fully diluted equity. Only one member of the Series E Board (Moran) was disinterested and independent. Twigg was not independent for the additional reason that he was the Company's CEO and beholden for his position to the interested board majority. *See Rales v. Blasband,* 634 A.2d 927, 937 (Del.1993); *see also Orman v. Cullman,* 794 A.2d 5, 25 n. 50 (Del.Ch.2002).

The complaint's allegation that the Series E Board accepted the Noro–Moseley Funds' opening proposal, without negotiation or any effort to explore alternative financing, supports a reasonable inference of unfairness. So does the failure to adjust the conversion prices of the Series A, B, and C Preferred and the self-interested step of mitigating the dilution for holders of Series D and E Preferred, but not for the holders of the common.

#### b. The Follow-on Series E Issuances—Entire Fairness

Count III states a claim that the directors who approved the subsequent issuances of Series E Preferred breached their fiduciary duties in approving those transactions. None of the four follow-on issuances were approved by sufficient disinterested and independent directors to comprise a board majority. The two issuances in 2003 and the one issuance in 2004 were approved by two conflicted directors (Moseley and Gilroy), one inside director (Twigg), and only two disinterested, independent directors (Kennedy and Brown). The one issuance in 2006 was approved by two conflicted directors (Moseley and Gilroy), one inside director (Twigg), and only

one disinterested, independent director (Kennedy). The failure to modify or update the terms of the Series E Preferred to account for the Company's improving financial condition provides additional reason to infer that the follow-on offerings were unfair.

### c. The Initial Series E Financing— Duty Of Disclosure

■ Count III alleges that the Series E Board breached its duty of disclosure by failing "to obtain informed shareholder approval" for the Reverse Split and the Series E Charter. Compl. ¶ 210. The Series E Board failed to disclose that insiders or their affiliates benefitted from the transactions or to describe the benefits they received. This states a claim for breach of the fiduciary duty of disclosure. *See Dubroff v. Wren Hldgs., LLC,* 2009 WL 1478697, at *6 (Del.Ch. May 22, 2009) ("*Dubroff I* ").

### d. The Initial Series E Financing— Section 242

■ Counts IV and V assert that the adoption of the Reverse Split and the Series E Charter violated Section 242 of the DGCL. Under Section 242(b)(1), a corporation with capital stock only can amend its charter through a two-step process in which the board first approves the amendments and recommends them to stockholders, then the stockholders approve them. *See Blades v. Wisehart,* 2010 WL 4638603, at *8 (Del.Ch. Nov. 17, 2010). The statute states:

> If the corporation has capital stock, *its board of directors shall adopt a resolution setting forth the amendment proposed,* declaring its advisability, and either calling a special meeting of the stockholders entitled to vote *in respect thereof for the consideration of such amendment* or directing that the

amendment proposed be considered at the next annual meeting of the stockholders. Such special or annual meeting shall be called and held upon notice in accordance with § 222 of this title. The notice shall set forth *such amendment* in full or a brief summary of the changes to be effected thereby. At the meeting a vote of the stockholders entitled to vote thereon shall be taken for and against *the proposed amendment.* If a majority of the outstanding stock entitled to vote thereon, and a majority of the outstanding stock of each class entitled to vote thereon as a class has been voted in favor of *the amendment,* a certificate setting forth *the amendment* and certifying that *such amendment* has been duly adopted in accordance with this section shall be executed, acknowledged and filed and shall become effective in accordance with § 103 of this title.

8 *Del. C.* § 242(b)(1) (emphases added). Under this provision, "a certificate setting forth the amendment and certifying that such amendment has been duly adopted" becomes effective when filed with the Secretary of State. *Id.* It is plain that the references to "the amendment" and "such amendment" contemplate the same amendment that was the subject of the board resolution "setting forth the amendment proposed" and "declaring its advisability."

■ Bloodhound did not comply with this basic statutory requirement. The resolution approved by the directors stated:

> [I]n connection with the [Reverse Split] . . . the respective conversion prices of the issued and outstanding shares of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock and Series D Preferred Stock of the Company (collectively, "Preferred Stock") shall be proportionately adjusted in accordance with the terms of the

Amended and Restated Certificate of Incorporation.

Compl. Ex. R. The actual certificate filed by Bloodhound with the Secretary of State *did not revise the conversion prices of the Series A, B, or C Preferred.* Compl. Ex. L. The filed amendment did not conform to the resolution adopted by the board.

■ The complaint also alleges a statutory violation on the theory that the Reverse Split was not approved by a majority of the common stockholders. Compl. ¶ 228. If Abed's consent was valid, then the Reverse Split received the necessary vote. The plaintiffs therefore argue that the written consent Abed executed failed to comply with Section 228 of the DGCL because it did not adequately describe the actions taken. *Id.* ¶ 231. Section 228 states:

> Unless otherwise provided in the certificate of incorporation, any action required by this chapter to be taken at any annual or special meeting of stockholders of a corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, *setting forth the action so taken,* shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present. . . .

8 *Del. C.* § 228(a) (emphasis added). The form of consent provided to Abed incorporated by reference the Series E Charter and the certificate of amendment for the

Reverse Split. They were cited respectively as Exhibits A and B in the consent, but neither was attached or otherwise provided to Abed. Compl. Ex. S.

The defendants point out that when stockholders are asked to vote on an amendment to the certificate of incorporation at a meeting, the notice can provide the text of the amendment "in full" or "a brief summary of the changes to be effected thereby." 8 *Del. C.* § 242(b)(1). The consent summarized the actions taken, but the language of Section 242(b)(1) is premised on action being taken *at a meeting.* Section 228(a) establishes a different requirement: the consent must "set[ ] forth the action so taken."

■ Because Section 228 permits immediate action without prior notice to minority stockholders, the statute involves "great potential for mischief" and its requirements must be "strictly complied with if any semblance of corporate order is to be maintained." *Empire of Carolina, Inc. v. Deltona Corp.,* 501 A.2d 1252, 1255–56 (Del.Ch.1985), *aff'd,* 505 A.2d 452 (Del. 1985).[1] When a consent specifically refers to exhibits and incorporates their terms, the plain language of Section 228(a) requires that a stockholder have the exhibits to execute a valid consent. This aspect of Count IV states a claim.

The complaint does not otherwise allege a statutory violation (as opposed to a breach of fiduciary duty) based on the fact that the Series E Charter specified unadjusted conversion prices for the Series A, B, and C Preferred. Corporate acts are "twice-tested," once for statutory compliance and again in equity. *Sample v. Morgan,* 914 A.2d 647, 672 (Del.Ch.2007) (quot-

---

**1.** *See also H–M Wexford LLC v. Encorp, Inc.,* 832 A.2d 129, 151–52 (Del.Ch.2003) (invalidating consents that were not individually dated by the signers and bore the same printed date and noting that "the date requirement

... must be strictly enforced"); *Freeman v. Fabiniak,* 1985 WL 11583, *5 (Del.Ch. Aug. 15, 1985) (noting need to "carefully scrutinize" consents in determining Section 228 compliance).

ing Adolphe A. Berle, *Corporate Powers As Powers In Trust*, 44 Harv. L.Rev. 1049, 1049 (1931)). Assuming the adoption of the Series E Charter was otherwise valid, then the amendment process could be used to reset the economic rights of the Series A, B, and C Preferred, subject to the constraints of equity.

### 3. The Claims Relating To The Merger And MIP

■ The complaint states a claim against the Merger Board for breach of fiduciary duty in approving the Merger and the MIP. Moseley, Twigg, Kennedy, and Elliot comprised the Merger Board. Twigg received approximately $7.5 million from the MIP; Kennedy received approximately $375,000. The payments gave these directors a personal interest in the Merger not shared by the other stockholders. Consequently, the Merger Board lacked sufficient independent and disinterested directors to comprise a board majority. I therefore need not consider whether the differential consideration (relative to the common stockholders) that the Fund Defendants received through their holdings of preferred stock and its associated liquidation preferences created a conflict of interest for Moseley and Elliot. The diversion of 18.87% of the Merger consideration through the MIP supports a reasonable inference that the Merger was unfair.

Although the business judgment rule has been rebutted, the complaint does not suggest why Moseley, Elliot, and the Fund Defendants would have had a reason to sell Bloodhound if the Merger were not the optimal wealth-maximizing strategy. Based on the facts pled, it seems likely that the total consideration obtained in the Merger will not be subject to legitimate challenge, and that the case will turn on (i) whether it was fair to allocate 18.87% of the consideration to management through the MIP and (ii) whether any of the preferred stock was wrongfully issued or wrongfully granted additional conversion rights, such that amounts paid to the holders of those shares otherwise would have been available to holders of common stock.

### 4. The Claims Against The Fund Defendants

■ The complaint states a claim against the Fund Defendants for aiding and abetting the alleged breaches of fiduciary duty by the individual defendants. The aiding and abetting theory parallels the plaintiffs' grounds for asserting personal jurisdiction over the Fund Defendants under the conspiracy theory of jurisdiction. Although there are perhaps some finely nuanced differences between aiding and abetting a breach of fiduciary duty and conspiracy to commit a breach of fiduciary duty,[2] the two are functionally equivalent for present purposes.[3]

2. *See Metro. Life Ins. Co. v. Tremont Gp. Hldgs., Inc.*, 2012 WL 6632681, at *18–20 (Del.Ch. Dec. 20, 2012) (analyzing claim for aiding and abetting a breach of fiduciary duty separately from conspiracy to commit a breach of fiduciary duty); *Hospitalists of Del., LLC v. Lutz*, 2012 WL 3679219, at *15–16 (Del.Ch. Aug. 28, 2012) (same).

3. *See Malpiede v. Townson*, 780 A.2d 1075, 1098 n. 82 (Del.2001) (noting in reference to underlying claim for breach of fiduciary duty that "[a]lthough there is a distinction between civil conspiracy and aiding and abetting, we

do not find that distinction meaningful here"); *Triton Const. Co., Inc. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *17 (Del.Ch. May 18, 2009) (finding that claim for aiding and abetting breach of fiduciary duty duplicated claim for civil conspiracy), *aff'd*, 988 A.2d 938 (Del.2010); *Allied Capital Corp. v. GC–Sun Hldgs., L.P.*, 910 A.2d 1020, 1038 (Del.Ch.2006) (stating that "courts have noted that in cases involving the internal affairs of corporations, aiding and abetting claims represent a context-specific application of civil conspiracy law"); *Benihana of Tokyo, Inc. v.*

■ "A claim for aiding and abetting requires the following three elements: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, and (3) a knowing participation in that breach...." *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 72 (Del.1995). Gilroy and Moseley were fiduciaries, and the complaint adequately pleads claims against them for a breach of duty. For the reasons discussed in Section II.A, the complaint adequately pleads that (i) Gilroy acted as an officer and agent of the Wakefield Fund and (ii) Moseley acted as a principal of Moseley & Co., which in turn acted as the general partner of the Noro–Moseley Funds. Gilroy and Moseley's knowledge is therefore imputed to the Fund Defendants. *See, e.g., Metro. Life Ins.*, 2012 WL 6632681, at *19; *Khanna v. McMinn*, 2006 WL 1388744, at *27 (Del.Ch. May 9, 2006); *Carlson v. Hallinan*, 925 A.2d 506, 542 (Del.Ch.2006). The elements for aiding and abetting are met.

### 5. Constructive Fraud

■ Counts II and IV reframe the allegations of Counts I and III under the heading of "constructive fraud." Chancellor Strine, then-Vice Chancellor, confronted a similar situation in *Parfi Holding*. As in this case, the plaintiffs in *Parfi Holding* alleged constructive fraud based on issuances of shares that the plaintiffs contended were unfairly dilutive. Chancellor Strine saw "no utility" in recasting claims for a breach of fiduciary duty under the heading of constructive fraud. 794 A.2d at 1235.

The concept of constructive fraud is an ill-defined one, but generally exists to prevent wrongdoing by someone who occupies a special position of confidence or trust, such as that of a fiduciary. Our corporate case law has thrown this concept around in a not particularly precise way, but always in a context in which the court is examining whether directors have complied with their fiduciary duties.

*Id.* at 1236 (footnote omitted). The Chancellor concluded that cases applying the label of "constructive fraud" to dilutive issuances were "describ[ing] a breach of fiduciary duty, and not ... using it as a separate, independent tort." *Id.* at 1236–37 (footnote omitted). The same is true here. The constructive fraud counts are duplicative and dismissed.

### 6. The Claims Against Bloodhound

■ Counts I–IV and VII name Bloodhound as a defendant to the claims for breach of fiduciary duty and its equivalent, constructive fraud. Bloodhound does not owe fiduciary duties to the plaintiffs. *See In re Wheelabrator Techs. Inc. S'holders Litig.*, 1992 WL 212595, at *9 (Del.Ch. Sept. 1, 1992) ("[T]he corporate entity as such is not a fiduciary to its stockholders and cannot be held liable to them on that basis."). Counts I–IV and VII are dismissed as to Bloodhound.

### C. The Defenses

The defendants have raised defenses including their ability to exercise a redemption right, laches, exculpation, the statutory bar of Section 124, and standing. The

---

*Benihana, Inc.*, 2005 WL 583828, at *7 (Del. Ch. Feb. 4, 2005) (equating claim for aiding and abetting breach of fiduciary duty with conspiracy to commit breach of fiduciary duty), *aff'd*, 906 A.2d 114 (Del.2006); *Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 131 (Del.Ch.1986) ("A claim for civil conspiracy (sometimes called 'aiding and abetting') requires that three elements be alleged and ultimately established...."); *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1057 (Del.Ch.1984) (identifying the same elements for "a claim of civil conspiracy" as for aiding and abetting), *aff'd*, 575 A.2d 1131 (Del.1990).

Section 124 and standing defenses are rejected. The other defenses do not warrant dismissal at this stage of the case.

### 1. The Redemption Right

The defendants seek dismissal of any claims relating to the Merger on the theory that the preferred stockholders could have acted together to take 100% of the value of the Company by exercising their redemption rights. According to the defendants, "the preferred investors had a contractual right under the certificate of incorporation to force the Company to redeem their preferred shares at any time after the fifth anniversary of the issuance [of] the Series E preferred stock, a date that had passed more than three years before the Merger." Op. Br. at 40 (footnote omitted). The defendants say they cannot be held liable in connection with the Merger, in which the common stockholders received at least something, because they had a contractual right to take everything. *Id.*

■■■■■ A redemption right does not give the holder the absolute, unfettered ability to force the corporation to redeem shares under any circumstances. Section 160 of the DGCL places restrictions on the ability of a Delaware corporation to redeem its shares. It provides, in pertinent part:

(a) Every corporation may purchase, redeem, receive, take or otherwise acquire ... its own shares; provided, however, that no corporation shall:

(1) Purchase or redeem its own shares of capital stock for cash or other property when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation, except that a corporation ... may purchase or redeem out of capital any of its own shares which are entitled upon any distribution of its assets, whether by dividend or in liquidation, to a preference over another class or series of its stock ... if such shares will be retired upon their acquisition and the capital of the corporation reduced in accordance with §§ 243 and 244 of this title.

8 *Del. C.* § 160. "A repurchase impairs capital if the funds used in the repurchase exceed the amount of the corporation's 'surplus,' defined by 8 *Del. C.* § 154 to mean the excess of net assets over the par value of the corporation's issued stock." *Klang v. Smith's Food & Drug Ctrs., Inc.,* 702 A.2d 150, 153 (Del.1997). "Net assets means the amount by which total assets exceed total liabilities." 8 *Del. C.* § 154. Under Section 160(a)(1), therefore, unless a corporation redeems shares and will retire them and reduce its capital, "a corporation may use only its surplus for the purchase of shares of its own capital stock." *In re Int'l Radiator Co.,* 92 A. 255, 256 (Del.Ch.1914).

The restrictions on redemption imposed by Section 160 are one critical factor that distinguishes preferred stock from debt. *See Harbinger Capital P'rs Master Fund I, Ltd. v. Granite Broad. Corp.,* 906 A.2d 218, 225–26 (Del.Ch.2006); *Mesa Hldg. Ltd. P'ship v. Bicoastal Corp.,* 1991 WL 17172, at *2 (Del.Ch. Feb. 11, 1991). The distinction benefits VC-backed corporations by enabling preferred stock with debt-like features to be treated as equity for tax purposes. *See* Ronald J. Gilson & David M. Schizer, *Understanding Venture Capital Structure: A Tax Explanation for Convertible Preferred Stock,* 116 Harv. L.Rev. 874, 902–04 (2003) (explaining the tax benefits of preferred stock relative to debt); *see also* George W. Dent, Jr., *The Role of Convertible Securities in Corporate Finance,* 21 J. Corp. L. 241, 261–62 (1996) (citing advantages of convertible preferred for unseasoned companies). In

other circumstances, equity treatment for preferred stock carries regulatory benefits. *See* Mark P. Gergen & Paula Schmitz, *The Influence of Tax Law on Securities Innovation in the United States: 1981–1997,* 52 Tax L.Rev. 119, 132–33, 155–56 (1998) (discussing tax implications of various securities).

By investing in preferred stock, the defendants contracted for equity treatment, received the attendant benefits, and accepted the concomitant limitations, including restrictions like those found in Section 160. The allegations of the complaint support a reasonable inference that Bloodhound lacked the ability to comply with a mandatory redemption right. Although Bloodhound is depicted as never so desperate for funds as to require the allegedly unfair terms set by the defendants, the entity is portrayed as a company that did not generate profits and which lacked substantial surplus (if any). One can reasonably infer based on the allegations of the complaint that the defendants could not have forced Bloodhound to redeem their shares. *See SV Inv. P'rs, LLC v. ThoughtWorks, Inc.,* 7 A.3d 973, 976 (Del. Ch.2010), *aff'd,* 37 A.3d 205 (Del.2011); *see also* Therese H. Maynard & Dana M. Warren, *Business Planning: Financing the Start-up Business and Venture Capital Financing* 575–76 (2010). The redemption right does not provide a basis to dismiss the complaint.

### 2. Laches

The defendants invoke the doctrine of laches. "[A]ffirmative defenses, such as laches, are not ordinarily well-suited for treatment on [a Rule 12(b)(6) motion to dismiss]." *Reid v. Spazio,* 970 A.2d 176, 183 (Del.2009) (footnote omitted). Laches can be applied at the pleadings stage only if "the complaint itself alleges facts that show that the complaint is filed

too late...." *Kahn v. Seaboard Corp.,* 625 A.2d 269, 277 (Del.Ch.1993) (Allen, C.).

"[T]he limitations of actions applicable in a court of law are not controlling in equity." *Reid,* 970 A.2d at 183 (footnote omitted). Nevertheless, because equity generally follows the law, "a party's failure to file within the analogous period of limitations will be given great weight in deciding whether the claims are barred by laches." *Whittington v. Dragon Gp., L.L.C.,* 991 A.2d 1, 9 & n. 17 (Del.2009) (citing *Adams v. Jankouskas,* 452 A.2d 148, 157 (Del.1982)). The analogous limitations period for a breach of fiduciary duty claim is three years. *See* 10 *Del. C.* § 8106; *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.,* 860 A.2d 312, 319 (Del.2004).

The complaint was filed on March 4, 2012. Any cause of action that accrued before March 4, 2009, is therefore presumptively barred by laches. Except for Count VII, which challenges the Merger and MIP, all of the causes of action accrued long before March 4, 2009. To save their claims, the plaintiffs rely on equitable tolling and fraudulent concealment.

"Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary." *Weiss v. Swanson,* 948 A.2d 433, 451 (Del.Ch.2008) (footnote omitted). "The obvious purpose of the equitable tolling doctrine is to ensure that fiduciaries cannot use their own success at concealing their misconduct as a method of immunizing themselves from accountability for their wrongdoing." *In re Am. Int'l Gp., Inc.,* 965 A.2d 763, 813 (Del.Ch.2009) (footnote omitted). The statute of limitations does not begin to run until a plaintiff is "objectively aware of the facts giving rise

to the wrong, *i.e.* on inquiry notice." *Weiss,* 948 A.2d at 451.

██ The plaintiffs argue that equitable tolling preserves their claims regarding the initial Series D Financing. Although the Series D Financing involved the filing of an amended and restated certificate of incorporation with the Secretary of State, it would be unreasonable to expect stockholders to monitor the Secretary of State's filing system, pay to obtain each new filing, and scour it for evidence of potential injury. As the United States Supreme Court recently observed in a related context, "[m]ost of us do not live in a state of constant investigation; absent any reason to think we have been injured, we do not typically spend our days looking for evidence that we were lied to or defrauded." *Gabelli v. S.E.C.,* —— U.S. ——, 133 S.Ct. 1216, 1222, 185 L.Ed.2d 297 (2013).

To the extent the plaintiffs had taken the initiative to obtain and examine the corporate filings with the Secretary of State, the relevant filings did not contain information sufficient to put the plaintiffs on notice. The amended and restated certificate of incorporation for the Series D Financing did not disclose the identities of the investors who participated in the transaction, and it would not have been possible to discern that the principal purchasers were directors and their affiliates. This is sufficient to defeat a laches defense. *See Dubroff I,* 2009 WL 1478697, at *6 (rejecting laches defense where documents on which defendants relied "did not state that [the] 'existing investors' were also members of NSC's board of directors (or, more accurately, entities related to those directors)").

The amended and restated charter also disclosed only the terms of the Series D Preferred. Many of the critical rights that the investors received appear in a Series D Preferred Stock Purchase Agreement, which was not filed publicly. The documents on file with the Secretary of State also did not provide any information about the lack of effort to explore alternative financing options or third party pricing. Nor did they describe the contemporaneous equity grants to management.

The plaintiffs were entitled to rely on the board members to not use the Series D Financing to enrich themselves and their affiliated funds. Equitable tolling applies with respect to the Series D Financing.

For similar reasons, equitable tolling applies with respect to the Series E Financing. Critical investor rights appeared only in a separately executed and not publicly filed Series E Preferred Stock Purchase Agreement. It was not possible to discern from the documents filed with the Secretary of State the identities of the purchasers of the Series E Financing, the lack of effort to explore alternative financing options, or the contemporaneous equity grants to management.

██ Equitable tolling likewise applies to the failure to adjust the conversion prices for the Reverse Split. If a preternaturally industrious stockholder had thought to access the Secretary of State website, paid to obtain copies of the pre- and post-amendment charters, and carefully compared pre-amendment Subsections IV.B.4.b.(i)-(iv) with post-amendment Subsections IV.B.4.a.(i)-(iv), a stockholder theoretically might have noticed that the conversion prices remained the same. But stockholders need only be *reasonably* diligent. They are not required to examine every managerial act with a jaundiced eye, independently obtain and cull through corporate filings, and figure out the implications of four numbers in 27 pages of dense, single-spaced, legal text. Compl. Ex. L.; *see e.g., Weiss,* 948 A.2d at 452 (rejecting argument that stockholders were on inqui-

ry notice when identifying the alleged wrongdoing would have required culling through and comparing numerous publicly available documents); *In re Tyson Foods, Inc.*, 919 A.2d 563, 591 (Del.Ch.2007) (same).

 It is true that plaintiff Abed signed a written consent authorizing the Series E Financing, but the defendants have not provided any grounds for imputing any knowledge Abed might have had to the other plaintiffs, who remain entitled to rely on equitable tolling. *Cf. Johnston v. Pedersen*, 28 A.3d 1079, 1092 (Del.Ch. 2011) (declining to reach unclean hands defense that did "not apply to ... the other two plaintiffs in this action" and whose "participation as plaintiffs supports relief regardless of any defense against [the other plaintiff]"); *accord Keyser v. Curtis*, 2012 WL 3115453, at *18 (Del.Ch. July 31, 2012) (denying the availability of the defense as to a subsequent stock transaction where the defense was applicable to a previous stock transaction). For Abed, the allegations of the complaint support tolling on grounds of fraudulent concealment. Fraudulent concealment "requires an affirmative act of concealment by a defendant-an actual artifice that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry." *Ryan v. Gifford*, 918 A.2d 341, 360 (Del.Ch.2007) (internal quotation marks and footnote omitted). The partial disclosure of facts in a misleading or incomplete way can rise "to the level of actual artifice." *Tyson Foods*, 919 A.2d at 588.

The complaint pleads acts of fraudulent concealment in connection with the soliciting of Abed's vote on the Series E Financing. Neal suggested to Abed that he wait until after the Series E Financing closed to decide whether to pay off the note or return the Note Shares, which enabled the Series E Board to get the requisite written consent to approve the Series E Financing without having to solicit other members of the Founding Team. Neal did not provide Abed with the written consent until hours before the Series E Financing was supposed to close, and he did not include the proposed amendments. After Abed asked for the exhibits, Neal did not provide them. According to the complaint, Neal previously told Abed that it was essential that he sign the written consent promptly. After Abed returned the written consent, Neal said the exhibits would be forthcoming. Neal did not actually provide them until Abed surrendered his Note Shares. Even then, the versions provided were not the final documents. *See e.g.,* Compl. Ex. T. (supplying draft certificate dated November 6, 2002 rather than final certificate filed November 12, 2002). At the pleading stage, this course of conduct supports a reasonable inference of fraudulent concealment.

There is no contention that notice was provided to any plaintiff with respect to the subsequent issuances of Series E Preferred that took place on June 23, 2003, November 4, 2003, August 31, 2004, and April 7, 2006. Equitable tolling applies to the claims challenging those issuances.

Laches therefore is not a defense to the plaintiffs' causes of action. Because equitable tolling and fraudulent concealment preserve the plaintiffs' claims, I need not address the plaintiffs' contention that equitable defenses cannot "imbue void stock with the attributes of valid shares." *STAAR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1137 (Del.1991).

### 3. Section 102(b)(7)

 The individual defendants contend that the complaint only pleads care claims for which they are exculpated under

Bloodhound's charter. The complaint adequately pleads breaches of loyalty. If the facts as pled are proven at trial, then exculpation will not be available to at least some of the defendants. A defendant-by-defendant analysis can await a later stage of the case. *Cf. Emerald P'rs v. Berlin,* 726 A.2d 1215, 1224 (Del.1999) (reversing grant of summary judgment in favor of seemingly disinterested and independent directors as premature in entire fairness case).

### 4. Section 124

Count V seeks "a declaration that the 10–1 Reverse Split and all shares of the purported Series E convertible preferred stock are null and void" because the Reverse Split failed to comply with Section 242 of the DGCL. Compl. ¶ 234. Count VI seeks "a declaration that the conversion rights of the preferred shareholders as set forth in [the Series E Charter] are null and void." *Id.* ¶ 242. The defendants contend that neither count can be maintained in light of Section 124 of the DGCL.

Section 124 is entitled "Effect of lack of corporate capacity or power; *ultra vires.*" It states:

No act of a corporation and no conveyance or transfer of real or personal property to or by a corporation shall be invalid by reason of the fact that the corporation was *without capacity or power* to do such act or to make or receive such conveyance or transfer, but such lack of capacity or power may be asserted:

(1) In a proceeding by a stockholder against the corporation to enjoin the doing of any act or acts or the transfer of real or personal property by or to the corporation....

(2) In a proceeding by the corporation, whether acting directly or through a receiver, trustee or other legal representative, or through stockholders in a representative suit, against an incumbent or former officer or director of the corporation, for loss or damage due to such incumbent or former officer's or director's unauthorized act;

(3) In a proceeding by the Attorney General to dissolve the corporation, or to enjoin the corporation from the transaction of unauthorized business.

8 *Del. C.* § 124 (emphasis added). The defendants observe that the current action is not brought by the Attorney General, styled as a derivative action, or an injunction proceeding. Therefore, they say, Section 124 prevents the plaintiffs from arguing that the Reverse Split, the Series E Preferred, and the conversion rights in the Series E Charter are void.

"Section 124 was added in 1967 and has not been changed substantially since that time." 1 Edward P. Welch, *et al., Folk on the Delaware General Corporation Law* § 124.1, at GCL–II–22 (5th ed. 2013–1 Supp.). Section 124 was one of several provisions that sought to put to rest any lingering questions about corporate "capacity or power," 8 *Del. C.* § 124, and "especially limitations thereon as embodied in the concept of ultra vires, which loomed large in the earlier days of the corporation law...." 1 David A. Drexler, *et al., Delaware Corporation Law and Practice* § 11.01, at 11–1 (Supp.2012).

Broadly stated, the ultra vires doctrine which Section 124 abolishes declared that a corporation, or a party contracting with a corporation, could assert as a defense in a suit to enforce its or his obligations under such contract that, in entering into the otherwise lawful contract, the corporation acted outside the scope of ... its authorized powers. It was a double-edged sword, available under certain circumstances to both corporations and those contracting with

corporations to escape from their contractual liabilities.... [D]uring the formative years of corporation law in the 19th and early 20th centuries, the ultra vires doctrine was an oft-recurring theme in litigation seeking to enforce or avoid corporate contractual obligations, leading to much confusion and patently inequitable results. Actually, the case law in Delaware was such that the doctrine had very little scope. However, no decision had ever clearly nullified its application.

*Id.* § 11.05, at 11–10. Before the adoption of Section 124 and its sister provisions, the desire to preempt an *ultra vires* defense "led the old school of corporate draftsmen to include page after page of boiler-plate corporate powers in the 'purpose' sections of their certificates of incorporation." *Id.* The sections resulted in "[c]orporate charters of stultifying length and complexity," but without them, the drafters ran the risk that a contract could be held invalid, perhaps to the corporation's benefit but equally possibly to its detriment. *Id.*

The 1967 revision sought to address any questions about corporate capacity or power by

(i) removing from Section 102(b)(2) any requirements that a certificate of incorporation set out explicitly the specific business or purposes for which a corporation is organized, thereby removing the statutory requirement that charters set forth express or implicit limitations upon what business a corporation might pursue; (ii) eliminating from Section 121 all implications that the corporate powers and authority granted to Delaware corporations are strictly limited to those powers expressly granted by the statute or their certificates of incorporation, and (iii) abolishing through enactment of Section 124 whatever vestiges of the ultra vires doctrine may have remained

with respect to the corporation's dealings with third parties....

*Id.* § 11.01, at 11–1. These steps "have for virtually all intents and purposes obviated inquiries into whether or not Delaware corporations as a matter of their fundamental power or authority can undertake otherwise lawful acts." *Id.* Section 124 was not the main event in the effort. It was the clean-up provision intended to catch any vestige of the traditional *ultra vires* doctrine that might have slipped past the other sections. Consequently, Section 124 must be read in conjunction with the other provisions of the DGCL that sought to address the historic debate over corporate capacity or power.

In the DGCL, the primary provision addressing the *ultra vires* problem is Section 121(a), which states:

In addition to the powers enumerated in § 122 of this title, every corporation, its officers, directors and stockholders shall possess and may exercise all the powers and privileges granted by this chapter or by any other law or by its certificate of incorporation, together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the business or purposes set forth in its certificate of incorporation.

8 *Del. C.* § 121(a). Notably, Section 121(a) confers corporate power not solely on the corporation but collectively on "every corporation, its officers, directors and stockholders." By using this terminology, Section 121(a) intentionally avoided attempting to determine which actors or combinations of actors could cause the corporation to exercise its powers. "[The DGCL] elsewhere ascribes to each of these groups specific powers and authority with respect to specific types of transactions. It is to these latter provisions that one

must look to determine which group or groups can exercise, singly or jointly, particular powers." Drexler, *supra*, § 11.02, at 11–3. To reinforce this distinction, Section 121(b) provides that when exercising the powers conferred by Section 121(a), the corporation "shall be governed by the provisions and be subject to the restrictions and liabilities contained in this chapter." 8 *Del. C.* § 121(b).

The two subsections of Section 121 thus distinguish between the presence of corporate capacity or power and the statutory requirements for causing the corporation to exercise its powers. The same distinction applies to provisions in the certificate of incorporation that addresses the exercise of corporate power.

> [T]he statutory grant of the corporate power collectively to stockholders, officers, and directors, as well as to the corporation itself, means that a particular corporation, by appropriate provision in its certificate of incorporation, may alter the statutory allocation of power or authority among these groups *without impairing the ability of the corporation itself to exercise those powers.*

Drexler, *supra*, § 11.02, at 11–3 (emphasis added).

> Which of the groups is to exercise specific powers, and the manner in which

the group is to exercise such powers, is either set forth in the various sections of the General Corporation Law (relating to such matters as amendments to the certificate of incorporation, mergers, sales of assets, etc.), the certificate of incorporation or by-laws, or is allocated according to traditional common law concepts of exercise of corporate power.

1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 2.1, at 2–2 (3d ed. Supp.2013) (footnotes omitted).

■■■■■ The distinction between the existence of "capacity or power" and compliance with requirements for exercising "capacity or power" has critical implications for Section 124. The traditional *ultra vires* doctrine covered by Section 124 only addressed the former question. By its terms, the doctrine applied when a contract was alleged to be invalid because of an absence of corporate "capacity or power." [4] Section 124 does not address disputes over whether corporate actors properly caused the corporation to exercise its capacity or power.

The non-exclusive list of specific powers conferred on corporations by Section 122 helps illustrate this distinction. *See* 8 *Del. C.* § 122.[5] Section 122(6) grants to a Dela-

---

**4.** The DGCL retains only three limitations on corporate capacity or power. *See* Balotti & Finkelstein, *supra*, §§ 2.4–2.6. First, with specified exceptions, no corporation formed under the DGCL after April 18, 1945, may confer academic or honorary degrees. 8 *Del. C.* § 125. Second, no corporation formed under the DGCL can exercise banking power. 8 *Del. C.* § 126(a). Third, a Delaware corporation that is designated as a private foundation under the Internal Revenue Code cannot fail to comply with certain tax provisions, unless its charter provides that the restriction is inapplicable. 8 *Del. C.* § 127. Given the broad scope of Section 121 and the limited exceptions in Sections 125, 126, and 127, the *ultra vires* doctrine has little remaining statu-

tory purchase, even without Section 124. Nevertheless, a corporation retains the ability to introduce uncertainty about its capacity or power by including provisions in its charter that forbid it from entering into particular lines of business or engaging in particular acts. *See* Balotti & Finkelstein, *supra*, § 2.1. In those situations, Section 124 provides a helpful backstop.

**5.** The powers enumerated in Section 122 are "a curious mixture." Drexler, *supra*, § 11.03[1], at 11–4.

> Some of them deal exclusively with the organic structure of the corporation itself. A second group addresses the internal functioning of the corporation, while a third

ware corporation the power to "[a]dopt, amend and repeal bylaws." 8 *Del. C.* § 122(6). At the same time, Section 109 governs how the corporation can be caused to exercise its power. *See* 8 *Del. C.* § 109. Section 109(a) states that for a corporation authorized to issue capital stock, the corporate power to cause bylaws to be adopted, amended, or repealed may be exercised by (i) the incorporators until a board of directors is designated, (ii) the board of directors until the corporation has received any payment for any of its stock, (iii) the stockholders after the corporation has received any payment for any of its stock, and (iv) the board of directors concurrently with the stockholders if the certificate of incorporation so provides, except where otherwise limited by the DGCL. *Id.* § 109(a); *see also* Drexler, *supra,* § 9.02. Section 109(b) places an additional limitation on the exercise of the corporate power by providing that "[t]he bylaws may contain any provision, not inconsistent with law or with the certificate of incorporation, relating to the business of the corporation, the conduct of its affairs, and its rights or powers or the rights or powers of its stockholders, directors, officers or employees." 8 *Del. C.* § 109(b); *see also* Drexler, *supra,* § 9.04.

Section 109 limits the exercise of the corporate power to adopt, amend, or repeal bylaws. For purposes of Section 124, the capacity or power always exists. 8 *Del. C.* § 122(6). If, for example, the charter provides that directors can amend, alter, or repeal bylaws only by the unanimous vote of a quorum consisting of all members of the board then in office, the fact that a majority of directors then in office purported to adopt a bylaw at a meeting attended only by those directors comprising a majority voting in favor raises an issue as to whether the bylaw is valid, but it does not raise an issue of "capacity or power" under Section 124. *Cf. Frantz Mfg. Co. v. EAC Indus.,* 501 A.2d 401, 407 (Del.1985) (determining the validity of a bylaw requiring a unanimous director vote and the validity of non-compliant action). For this reason, Delaware courts have had no difficulty entertaining (i) post-adoption challenges to the validity of bylaws in which damages were not the only remedy sought (*contra* Section 124(a) and (b)) and (ii) challenges to the validity of bylaws that were pursued as individual actions rather than in suits brought by or on behalf of the corporation (*contra* Section 124(b)).[6] Delaware courts similarly

---

group deals with the power to conduct various aspects of corporate business. The inclusion of a specific power on the list appears to have been a matter of historical accident, with additions having been made from time to time by amendment to address a perceived problem, without any overall concept or plan as to which corporate powers or types of powers ought to be specifically enumerated.

*Id.* One additional power—the power to deal in securities—is addressed specifically in Section 123. *See* 8 *Del. C.* § 123. A plausible argument can be made that Section 121 in its current form eliminates the need for Sections 122 and 123. *See* Drexler, *supra,* § 11.03[1], at 11–3; *see also id.* § 11.04, at 11–9. As someone who has now read many late nineteenth and early twentieth century *ultra vires*

cases, I have the sense that the powers enumerated in Sections 122 and 123 largely responded to specific court decisions which held that a corporation lacked the power in question.

**6.** *See, e.g., Airgas, Inc. v. Air Prods. & Chems., Inc.,* 8 A.3d 1182, 1194–95 (Del.2010) (invalidating bylaw as contrary to charter in post-adoption challenge); *Crown EMAK P'rs, LLC v. Kurz,* 992 A.2d 377, 398–402 (Del.2010) (invalidating bylaw as contrary to DGCL in post-adoption challenge brought as individual action); *Allen v. Prime Computer Inc.,* 540 A.2d 417, 420–21 (Del.1988) (same); *Datapoint Corp. v. Plaza Sec. Co.,* 496 A.2d 1031, 1036 (Del.1985) (same); *Sun–Times Media Gp., Inc. v. Black,* 954 A.2d 380, 407 (Del.Ch. 2008) (invalidating bylaw as contrary to char-

have entertained challenges to the validity of other corporate acts in which (i) damages were not the only remedy sought and (ii) the claims were pursued on an individual basis.[7]

The willingness of Delaware courts to consider whether an act of a corporation was not properly authorized or contrary to the DGCL, notwithstanding the adoption of Section 124, comports with the commentary to Section 6 of the Model Business Corporation Act. *See* Model Bus. Corp. Act. § 6 (1960). Professor Ernest Folk modeled his proposed version of Section 124 on Section 6.[8] As adopted, Section 124 parallels Section 6 with only incidental differences. The commentary to Section 6 states:

> Section 6 of the Model Act does not deal with intra vires corporate acts not authorized by the proper corporate authority. That problem is sometimes discussed as a phase of the ultra vires doctrine but it is not directly related to ultra vires. Ordinarily the board of directors can exercise all the powers of the corporation, but certain acts require shareholders' approval under the governing statutes or the articles. The question may, therefore, arise when action is taken pursuant to a resolution of the board of directors which, under the governing law or articles, requires shareholders' approval or when action is taken by corporate officers without authorization by the board of directors.... If a transaction, wholly or partially executed, is set aside for lack of due authorization, the corporation should not be allowed to keep the benefits which it has received.

Model Bus. Corp. Act. § 6 cmt. at 204 (1960); *see also* Robert S. Stevens, *A Proposal as to the Codification and Restatement of the Ultra Vires Doctrine*, 36 Yale L.J. 297, 299 (1927) (arguing that corporate codes should "establish a distinction, which has the virtue of being true, between capacity to act and authority to act"); Seymour D. Thompson, *The Doctrine of Ultra Vires in Relation to Private Corporations*, 28 Am. L.Rev. 376, 377 (1894) (distinguishing between the *ultra vires* defense and disputes over the proper

ter in post-adoption challenge); *Lions Gate Entm't Corp. v. Image Entm't Inc.*, 2006 WL 4782450, at *6 (Del.Ch. June 5, 2006) (invalidating bylaw as contrary to DGCL in post-adoption challenge brought as individual action); *Moon v. Moon Motor Car Co.*, 151 A. 298, 301 (Del.Ch.1930) (Wolcott, C.) (invalidating bylaw in post-adoption challenge brought as individual action).

7. *See, e.g.*, *Grimes v. Alteon Inc.*, 804 A.2d 256, 263–66 (Del.2002) (holding that oral contract to issue shares was invalid and unenforceable for lack of compliance with DGCL); *STAAR Surgical*, 588 A.2d at 1136 (holding that shares of common stock derived from invalidly issued preferred stock were themselves invalid in action brought by stockholders individually after the issuance); *Waggoner v. Laster*, 581 A.2d 1127, 1135 (Del.1990) (holding preferred stock invalid in post-issuance litigation where rights of shares exceeded board's authority under blank check provi-

sion); *Moran v. Household Int'l, Inc.*, 500 A.2d 1346, 1351–53 (Del.1985) (considering validity of stockholder rights plan under DGCL in post-adoption action); *Blades*, 2010 WL 4638603, at *10 (holding that forward stock split was not validly implemented in post-adoption litigation); *Carmody v. Toll Bros., Inc.*, 723 A.2d 1180, 1188–92 (Del.Ch. 1998) (holding that stockholder class stated individual claim in that dead-hand provision of rights plan was contrary to DGCL and invalid in lawsuit brought after adoption of rights plan).

8. *See* Ernest L. Folk, III, *Review of The Delaware General Corporation Law for the Delaware Corporation Law Revision Committee 1965–1967*, at 47–48 (1968), *available at* http://law.widener.edu/lawlibrary/research/onlineresources/delawareresources/delawarecorporationlawrevisioncommittee.aspx [hereinafter *Folk Report* ].

exercise of corporate authority). In addition, "Section 6, being limited to the defense of lack of capacity or power, does not affect the defense of illegality." *Id.; see* Henry Winthrop Ballantine, *Ballantine on Corporations* § 89, at 240 (1946) ("Such corporate transactions as are forbidden by statute or by common law ... should not be dealt with in terms of 'powers' or *ultra vires* "). Put simply, Section 124 only addresses capacity or power. It does not address whether a corporate act was validly authorized.

In support of a far broader reading of Section 124, the defendants cite *Southeastern Pennsylvania Transportation Authority v. Volgenau*, 2012 WL 4038509 (Del.Ch. Aug. 31, 2012) ("*SEPTA* "). There, common stockholders alleged that an already completed merger in which disparate consideration was paid violated an equal-consideration provision in the corporation's charter. *Id.* at *2. The defendants sought judgment on the pleadings, arguing that Section 124 barred the claim. The *SEPTA* decision noted that contrary to the defendants' position, Delaware cases have permitted stockholders to bring direct claims attacking completed corporate acts that failed to comply with charter provisions. *See id.* at *3 n. 11 (citing *Blue Chip Capital Fund II Ltd. P'ship v. Tubergen*, 906 A.2d 827, 828 (Del.Ch.2006) and *Gale v. Bershad*, 1998 WL 118022, at *1 (Del.Ch. Mar. 4, 1998)). The *SEPTA* decision did not identify a case that previously had interpreted Section 124 to block a direct claim of this type. Nevertheless, the *SEPTA* decision accepted the defendants' argument.

The defendants' position in *SEPTA* was not implausible, at least if Section 124 is read in isolation. The distinction between corporate capacity or power and compliance with statutory or charter-based requirements for its exercise depends on a degree of formalism more characteristic of nineteenth century thinking than twenty-first. Moreover, judicial decisions have long used the Latinism *"ultra vires"* loosely as a more erudite synonym for "invalid" or "void," rather than confining the term to its traditional role as a defense to contract actions. As early as 1908, a corporate treatise writer observed that "[t]he phrase *'ultra vires,'* while convenient and appropriate, has unfortunately been so often misused ... that it has lost the univocal character which should distinguish all legal terms or 'words of art.' " Arthur W. Machen, 2 *Modern Law of Corporations* § 1021, at 819 (1908). Henry Winthrop Ballantine expressed similar regret in his 1946 treatise, noting that "[t]he expression *'ultra vires'* has been used by courts and by writers in various meanings resulting in much confusion." Ballantine, *supra,* § 89, at 240. Delaware corporate decisions (including my own) have deployed the term colloquially by using it to describe a range of situations, such as (i) the failure of corporate action to comply with the requirements of a provision of the DGCL,[9] (ii) the failure of corporate action

---

9. *See Paolino v. Mace Sec. Int'l, Inc.*, 985 A.2d 392, 403 (Del.Ch.2009) ("A bylaw provision that conflicts with a mandatory provision of the General Corporation Law or the certificate of incorporation is *ultra vires* and void."); *Carlson*, 925 A.2d at 541 (holding that a company's advancement of directors' litigation expenses without the directors first submitting an undertaking failed to comply with 8 *Del. C.* § 145 and was *ultra vires* ); *see also Olson v.* *EV3, Inc.*, 2011 WL 704409, at *7 (Del.Ch. Feb. 21, 2011) (observing that "If COV effected the second-step Merger using shares received through the exercise of an invalid option, then the Merger itself would be subject to attack as *ultra vires* and void."); *Carmody*, 723 A.2d at 1191 ("Vesting the pill redemption power exclusively in the Continuing Directors transgresses the statutorily protected shareholder right to elect the directors who

to comply with the requirements of the charter,[10] (iii) the failure of a board to comply with the terms of a stock option plan,[11] (iv) acts of waste,[12] and (v) acts that could be found to be breaches of fiduciary duty.[13] None of these uses of *ultra vires* involves the issue addressed by Section 124.

To interpret Section 124 as deploying the concepts of *"ultra vires"* and the "absence of capacity or power" in a manner that is generally synonymous with "invalid" or "void" is inconsistent with the intent of the provision when read in conjunction with Sections 102(b)(2), 121, 122, and 123 of the DGCL and the historical effort by the drafters of the 1967 revision to stamp out the *ultra vires* defense to contract actions. *See* Drexler, *supra*, § 11.05, at 11–10; *see also Folk Report*, *supra* note 8, at 47 (describing the *ultra vires* doctrine that was the subject of Section 124 exclusively in terms of the contract defense). In my view, the fact that a complaint may use the term *"ultra vires"* or that a judicial decision may have done so in the past

does not give defendants license to unchain Section 124 from its moorings.

In this case, the defendants raise Section 124 to prevent inquiry into whether the directors and stockholders of Bloodhound properly authorized the Reverse Split, the Series E Charter, and the related issuances of Series E Preferred. A Delaware corporation, its officers, directors, and stockholders indisputably possess and have the capacity to exercise these corporate powers. *See* 8 *Del. C.* §§ 121–123, 151, 242. Whether Bloodhound's officers, directors, and stockholders properly caused it to amend its charter and issue preferred stock presents different questions that do not fall within the scope of Section 124. That section provides no solace for the defendants.

### 5. Standing

The defendants next contend that the complaint asserts breach of fiduciary duty claims that are derivative and that the Merger extinguished the plaintiffs' standing to pursue them. The complaint in fact

would be so empowered. For that reason, and because it is claimed that the Rights Plan's allocation of voting power to redeem the Rights is nowhere found in the Toll Brothers certificate of incorporation, the complaint states a claim that the 'dead hand' feature of the Rights Plan is *ultra vires*, and hence, statutorily invalid under Delaware law.").

**10.** *See Melzer v. CNET Networks, Inc.*, 934 A.2d 912, 914 (Del.Ch.2007) ("[T]o the extent a director knowingly backdated a stock option in violation of the company's charter, that director's action is *ultra vires* and is not the product of valid business judgment." (footnote omitted)); *Lions Gate*, 2006 WL 4782450, at *6 ("Because the charter does not confer the power to amend the bylaws upon the board, the Bylaw Amendment Provision is invalid, *ultra vires*, and void."); *Kohls v. Duthie*, 791 A.2d 772, 786 (Del.Ch.2000) ("Defendants are correct that a repurchase in violation of the Certificate would constitute an ultra vires act.").

**11.** *See Cal. Pub. Emps.' Ret. Sys. v. Coulter*, 2002 WL 31888343, at *11 (Del.Ch. Dec. 18, 2002) (deeming demand excused where "plaintiff alleges with particularity that repricing of directors' options in 1997 and 1999 was *ultra vires*.").

**12.** *See Hessler, Inc. v. Farrell*, 226 A.2d 708, 711 (Del.1967) (considering whether "an illegal gift of corporate assets" was *ultra vires* ); *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 897 (Del.Ch.1999) (noting waste claims are not "categorically *ultra vires* ").

**13.** *See Oberly v. Kirby*, 592 A.2d 445, 468 n. 17 (Del.1991) ("If disinterested directors [of a charitable corporation] approved a transaction that posed a clear threat to the charitable purpose or the assets of the corporation, their approval would be an *ultra vires* act. . . .").

pleads direct claims for (i) wrongful expropriation and (ii) unfair diversion of merger proceeds.

To determine whether a claim is derivative or direct, this Court must consider "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del.2004). Although each question is framed in terms of exclusive alternatives (*either* the corporation *or* the stockholders), some injuries affect *both* the corporation *and* the stockholders.[14] If this dual aspect is present, a plaintiff can choose to sue individually. *Loral Space & Commc'ns Inc. v. Highland Crusader Offshore P'rs, L.P.*, 977 A.2d 867, 868 (Del. 2009) (holding that where facts give rise to both derivative and direct claims, "[b]oth types of claims may be litigated").

### a. The Challenges To The Series D And E Financings

A dilutive stock issuance can have the requisite dual character. Because the board of directors has exclusive authority to issue stock, *see* 8 *Del. C.* §§ 152–157, shares of stock are deemed an asset of the corporation. Stock is a form of currency that can be exchanged for other forms of currency (such as cash) or used for a variety of corporate purposes, including paying off debts, acquiring tangible or intangible assets, compensating employees, or acquiring other entities. If a complaint contends that the corporation received too little for its shares, then in one sense, the injury is suffered by the corporation, which was harmed because it did not receive greater value in exchange. *See, e.g., Dubroff I*, 2009 WL 1478697, at *3 ("because the corporation has suffered an injury (inadequate payment for its shares) . . . any recovery would flow to the corporate treasury").

But in another sense, the effects of a stock issuance are felt primarily by the stockholders. Stock has value only to the extent it provides its holders with rights, such as the right to vote, to receive dividends when declared and paid, or to claim a share of net assets in liquidation. Those rights are shared with other stockholders. Consequently, the relative value of a particular block of stock is not fixed but rather depends on the number of other holders with similar rights. If the owner of 100 shares carrying 100 votes is the sole stockholder in the entity, then the shares carry 100% of the voting power and 100% of the economic rights. If there is a minority stockholder, then the same shares convey the ability to dictate the outcome of any stockholder vote, yield a majority of the

---

14. *See Gentile v. Rossette*, 906 A.2d 91, 99–100 (Del.2006) (explaining that claims alleging equity dilution can be direct or derivative); *Lipton v. News Int'l, Plc*, 514 A.2d 1075, 1079 (Del.1986) (finding that complaint pled "claims that support both individual and derivative causes of action"); *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 2011 WL 3371493, at *5 n. 31 (Del.Ch. Aug. 5, 2011) ("Although the *Tooley* formulation provides a two-part analysis for determining whether an asserted claim is direct or derivative, there are some limited exceptions where the same facts may support both direct and derivative claims."); *San Antonio Fire & Police Pension Fund v. Bradbury*, 2010 WL 4273171, at *9 n. 68 (Del.Ch. Oct. 28, 2010) ("The same facts may support both direct and derivative claims."); *Thornton v. Bernard Techs., Inc.*, 2009 WL 426179, at *3 n. 28 (Del.Ch. Feb. 20, 2009) ("It is possible for a claim to be both derivative and direct."); *Odyssey P'rs v. Fleming Co.*, 1998 WL 155543, at *3 (Del.Ch. Mar. 27, 1998) ("[I]n some circumstances, the same conduct (or aspects thereof) may give rise to both derivative and direct claims.").

net assets in liquidation, and likely would command a premium in a negotiated purchase. If the corporation is widely held, then the same shares represent a tiny minority position and have negligible influence. Because the rights that stock carries are relative, the effects of issuing additional stock necessarily will be felt at the stockholder level. That is why sophisticated venture capitalists bargain for extensive anti-dilution protections in their preferred stock investments. *See* Joseph W. Bartlett & Kevin R. Garlitz, *Fiduciary Duties In Burnout/Cramdown Financings*, 20 J. Corp. L. 593, 595–96 (1995).

An example illustrates the stockholder level effects:

> Take, for instance, an investor who purchases $1,000,000 of the company's Series A Preferred Stock in a financing that values the company at $3,000,000 prior to the financing (typically referred to as the "pre-money valuation"). After the financing, the investor should own twenty-five percent of the company—the result obtained by dividing the $1,000,000 investment by the $4,000,000 post-financing value of the company (i.e., $1,000,000 investment + $3,000,000 pre-money valuation). If the company later raises $5,000,000 [of Series B Preferred Stock] at a $5,000,000 pre-money valuation and no additional shares have been issued by the company since the Series A financing, the value of the original investors Series A Preferred Stock will have increased to $1,250,000 (i.e., 25% × $5,000,000 pre-money valuation), although its ownership of the company will be diluted to 12.5% (i.e.$1,250,000/ $10,000,000).

Robert P. Bartlett, III, *Understanding Price–Based Antidilution Protection: Five Principles to Apply When Negotiating a Down–Round Financing*, 59 Bus. Law. 23, 25 n. 5 (2003). In this example,

the corporation receives $5,000,000 for pieces of paper with the words "Series B" on them. The stockholders feel two effects: an increase in wealth (from $1,000,000 to $1,250,000) and a decrease in relative legal rights (from 25% to 12.5%, plus any special rights conferred on the Series B).

Now modify the example slightly:

> [I]f the company ... proposed a second-round Series B financing at a $2,000,000 pre-money valuation, the existing investor would experience a decrease in the value of its investment from $1,000,000 to $500,000 (i.e., 25% × $2,000,000 pre-money valuation) (again, assuming that no additional shares have been issued by the company since the previous financing). Assuming that $5,000,000 is raised in the financing, the company would issue 71.43% of its stock to the Series B investors (i.e. $5,000,000 investment/$7,000,000 post-financing valuation) and, after the financing, the existing investor would own only 7.14% of the company (i.e. $500,000/$7,000,000).

*Id.* at 25 n. 6. The corporation receives the same $5,000,000 for its pieces of paper. The stockholders feel two different effects: a decrease in wealth (from $1,000,000 to $500,000) and a decrease in relative legal rights (from 25% to 7.4%, plus any special rights conferred on the Series B).

As these examples show, the first question in the *Tooley* test—who suffered the alleged harm (the corporation or the suing stockholders, individually)-can be answered either way. The second question in the *Tooley* test—who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)—likewise can be answered either way. One remedy would be to require the defendants to pay more to the corporation, fixing the underpayment by requiring a greater investment. Or the remedy could

operate at the stockholder level, without any payment to the corporation, by adjusting the rights of the stock or invalidating a portion of the shares. *See In re Loral Space & Commc'ns Inc.*, 2008 WL 4293781, at \*32 (Del.Ch. Sept. 19, 2008) (reforming the securities purchase agreement to convert the preferred stock into non-voting common stock), *aff'd*, 977 A.2d 867 (Del.2009); *Linton v. Everett*, 1997 WL 441189, at \*7 (Del.Ch. July 31, 1997) (invaliding shares that directors issued to themselves for inadequate consideration).

In *Gentile*, the Delaware Supreme Court acknowledged the dual character of dilutive issuances and held that "[t]here is ... at least one transactional paradigm—a species of corporate overpayment claim—that Delaware case law recognizes as being both derivative and direct in character." 906 A.2d at 99 (footnote omitted).

> A breach of fiduciary duty claim having this dual character arises where: (1) a stockholder having majority or effective control causes the corporation to issue "excessive" shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders. Because the means used to achieve that result is an overpayment (or "over-issuance") of shares to the controlling stockholder, the corporation is harmed and has a claim to compel the restoration of the value of the overpayment. That claim, by definition, is derivative.
>
> But, the public (or minority) stockholders also have a separate, and direct, claim arising out of that same transaction. Because the shares representing the "overpayment" embody both economic value and voting power, the end result of this type of transaction is an improper transfer—or expropriation—of economic value and voting power from the public shareholders to the majority or controlling stockholder. For that reason, the harm resulting from the overpayment is not confined to an equal dilution of the economic value and voting power of each of the corporation's outstanding shares. A separate harm also results: an extraction from the public shareholders, and a redistribution to the controlling shareholder, of a portion of the economic value and voting power embodied in the minority interest. As a consequence, the public shareholders are harmed, uniquely and individually, to the same extent that the controlling shareholder is (correspondingly) benefited. In such circumstances, the public shareholders are entitled to recover the value represented by that overpayment—an entitlement that may be claimed by the public shareholders directly and without regard to any claim the corporation may have.

*Id.* at 99–100 (footnotes omitted). The *Gentile* Court declined to categorize this type of claim as one for "dilution," adopting "a more blunt characterization—extraction or expropriation—because that terminology describes more accurately the real-world impact of the transaction upon the shareholder value and voting power embedded in the (pre-transaction) minority interest, and the uniqueness of the resulting harm to the minority shareholders individually." *Id.* at 102 n. 26.

This Court has struggled with how to interpret *Gentile* and its potential to undercut the traditional characterization of stock dilution claims as derivative. *See, e.g., Feldman v. Cutaia*, 956 A.2d 644, 657 (Del.Ch.2007) (seeking to avoid an interpretation of *Gentile* that "would swallow

the general rule that equity dilution claims are solely derivative"), *aff'd,* 951 A.2d 727 (Del.2008). One line in the sand was to limit *Gentile*'s expropriation principle to cases involving a majority stockholder. *Id.* at 657. Unfortunately, the Delaware Supreme Court's decisions do not support this limitation.[15] And the core insight of dual injury applies to non-controller issuances in which insiders participate.

Envision a corporation that has issued 8,000,000 shares of common stock with a value of $1 per share. Assume the board has five members, all individuals otherwise unaffiliated with the company, and that they never got around to issuing themselves shares. Further assume that because the corporation was a startup, the directors have never received compensation for their service. Anticipating that the company may be sold profitably in the near future, the directors issue themselves 400,000 shares each at a price of $0.50 per share. Shortly thereafter, the corporation is acquired by merger for a total consideration of $12 million.

| | % Vote Pre–Issuance | % Vote Post–Issuance | Equity Value Pre–Issuance | Equity Value Post-issuance | Share of Merger Consideration |
|---|---|---|---|---|---|
| Directors | 0% | 20% | N/A | $1,800,000 | $2,400,000 |
| Stockholders | 100% | 80% | $8,000,000 | $7,200,000 | $9,600,000 |
| Total | 100% | 100% | $8,000,000 | $9,000,000 | $12,000,000 |

If the directors were sued for breach of fiduciary duty and moved to dismiss the claim on the grounds that it was derivative and the stockholders lost standing to sue in the merger, would not *Gentile* apply? Although there was no controlling stockholder pre-merger, the directors could be said to have expropriated value from the common stockholders in the manner contemplated by *Gentile.* In the resulting action, the directors would have the burden to show that the self-interested issuance was entirely fair. *Cf. Linton,* 1997 WL 441189, at *7.

▇▇▇▇▇ In my view, the Delaware Supreme Court's decisions preserve stockholder standing to pursue individual challenges to self-interested stock issuances when the facts alleged support an actionable claim for breach of the duty of loyalty. Standing will exist if a controlling stockholder stood on both sides of the transaction. Standing will also exist if the board that effectuated the transaction lacked a disinterested and independent majority. Standing will not exist if there is no reason to infer disloyal expropriation, such as when stock is issued to an unaffiliated third party, as part of an employee compensation plan, or when a majority of disinterested and independent directors approves the terms. The expropriation

---

**15.** See *Gatz v. Ponsoldt,* 925 A.2d 1265, 1274 (Del.2007) ("[W]here a *significant or controlling stockholder* causes the corporation to engage in a transaction wherein shares having more value than what the corporation received in exchange are issued to the controller, thereby increasing the controller's percentage of stock ownership at the public shareholders' expense, a separate and distinct harm results to the public shareholders, apart from any harm caused to the corporation, and from which the public shareholders may seek relief in a direct action." (emphasis added)); *Gentile,* 906 A.2d at 100 (describing doctrine as applying to a stockholder "having majority *or effective* control" (emphasis added)); *accord Loral,* 977 A.2d at 869 (quoting *Gentile* ).

principle operates only when defendant fiduciaries (i) had the ability to use the levers of corporate control to benefit themselves and (ii) took advantage of the opportunity.

■■■ With this understanding, the complaint pleads a direct claim. It does so because each financing challenged in the complaint was a self-interested transaction implicating the duty of loyalty and raising an inference of expropriation. It also does so because the Fund Defendants and their director representatives can be regarded as a control group for purposes of *Gentile*. Under this Court's precedents, standing can be maintained under *Gentile* if the complaint pleads that "a number of shareholders, each of whom individually cannot exert control over the corporation ... collectively form a control group [and] are connected in some legally significant way—e.g., by contract, common ownership, agreement, or some other arrangement— to work together toward a shared goal." *Dubroff I,* 2009 WL 1478697 at *3; *see Williamson v. Cox Commc'ns, Inc.,* 2006 WL 1586375, at *6 (Del.Ch. Jun. 5, 2006) (crediting inference that two significant shareholders, neither of whom independently held control "were in a controlling position and that they exploited that control for their own benefit"). The requisite degree of control can be shown to exist generally or "with regard to the particular transaction that is being challenged." *Williamson,* 2006 WL 1586375, at *4.

The complaint alleges that the director representatives of the Wakefield Fund, the Noro–Moseley Funds, and NC Bioscience worked together to use their board control and status as significant stockholders to cause Bloodhound to engage in the Series D Financing, the Series E Financing, and the follow-on issuances. The complaint alleges that in these transactions, Bloodhound issued shares carrying significantly greater rights than the value of the cash the corporation received, thereby increasing the ownership and control of the Wakefield Fund, the Noro–Moseley Funds, and NC Bioscience at the expense of the common stockholders. In each case, because the effect on the common stock was so dramatic, the funds' director representatives ensured that additional equity grants were provided to management, thereby offsetting the dilution and securing the support of the CEO-director (first Chastain and later Twigg). In connection with the Series E Financing, the defendants similarly countered the additional dilution inflicted by the failure to adjust the conversion prices of the Series A, B, and C Preferred by entering into side agreements with purchasers of Series D and E Preferred. No similar agreements were offered to the common stockholders, who suffered the full effect of the resulting wealth transfer. The complaint does not describe a single transaction in which the interests of the directors and their funds happened to align, but rather actions taken in concert, over time, to direct the company's capital raising activities in a self-interested way. The complaint supplements this account with specific instances in which the fund representatives worked together as a control group, such as the off-line discussions regarding the Series D Preferred. These allegations state an individual claim under *Gentile*. *See Dubroff v. Wren Hldgs., LLC,* 2011 WL 5137175, at *7 (Del.Ch. Oct. 28, 2011) (*"Dubroff III"*); *Williamson,* 2006 WL 1586375, at *6; *Zimmerman v. Crothall,* 2012 WL 707238, at *11 (Del.Ch. Mar. 5, 2011).

Applying *Gentile* in this fashion does not undermine the distinction between (i) controllers under *Kahn v. Lynch Communication Systems, Inc.,* 638 A.2d 1110 (Del.1994) (*"Lynch"*), and (ii) directors who collectively hold a significant block of

common stock and vote in favor of a transaction. "[T]he Lynch line of jurisprudence [ ] has been premised on the notion that when a controller wants the rest of the shares, the controller's power is so potent that independent directors and minority stockholders cannot freely exercise their judgment, fearing retribution from the controller." *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006). Because of the controller's influence, entire fairness has been held to apply *ab initio*, and the use of a single procedurally protective mechanism, such as a special committee or majority of the minority vote, does not restore the business judgment rule. *See Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1240 (Del.2012) ("[E]ven when an interested cash-out merger transaction receives the informed approval of a majority of minority stockholders or a well-functioning committee of independent directors, an entire fairness analysis is the only proper standard of review."). Directors who own common stock may have combined holdings approaching levels that could give rise to an inference of control, but the directors do not become a control group for purposes of *Lynch* simply because they took board level action.

> To find that [such a] board was a unified controlling stockholder would be unprincipled and create a negative precedent. As a general matter, it is useful to have directors with, as Ross Perot was wont to say, skin in the game. Such directors have a personal interest in ensuring that the company is managed to maximize returns to the stockholders. Glomming share-owning directors together into one undifferentiated mass with a single hypothetical brain would result in an unprincipled Frankensteinian version of

the already debatable 800–pound gorilla theory of the controlling stockholder that animates the *Lynch* line of reasoning.

*PNB Hldg.*, 2006 WL 2403999, at *10. A board in which each director holds sufficient common stock to give the director a personal interest in the economic fate of the undifferentiated equity, but where no one director has enough shares to control the corporation, is "arguably comprised in an ideal manner." *Id.*

Relying on *PNB Holding*, the defendants say the complaint alleges only that directors took board level action to maximize stockholder returns. But consistent with prior cases that have followed *Gentile* under similar circumstances, the complaint does not attempt to forge a control group out of individual directors who collectively own a significant quantity of common stock. The complaint rather alleges that certain directors owed conflicting fiduciary duties to the Fund Defendants, that the interests of the Fund Defendants as holders of preferred stock were not aligned with the interests of the common stockholders, that other directors were interested in the challenged transactions or not independent, and that through the challenged transactions, the defendants shifted value from the common stock to the preferred stock. The allegations of the complaint describe a case of interclass conflict in which the directors favored themselves, not an alignment of interests between the directors and the common. For purposes of standing under *Gentile*, these allegations state an individual claim. *See Dubroff III*, 2011 WL 5137175, at *7; *Williamson*, 2006 WL 1586375, at *6; *Zimmerman*, 2012 WL 707238, at *11.[16]

---

**16.** Although the *PNB Holding* decision held that *Lynch* did not apply, the transaction still

was reviewed under the entire fairness standard. *PNB Hldg.*, 2006 WL 2403999, at *12–

The relief that the Founding Team seeks reinforces the individual nature of the claims. The complaint only half-heartedly suggests that the total consideration obtained in the Merger was inadequate. The Founding Team's real beef is that more consideration should have dropped to the common and would have if the Series D and E Financings were not unfairly dilutive. Similarly the complaint does not allege that Bloodhound should have obtained larger amounts of money in the various financing rounds, but rather that directors issued shares with excessively onerous rights. The Founding Team does not want additional money from the investors in those deals. The Founding Team hopes to cancel or modify the shares that were issued, which in turn would result in a greater share of the merger consideration flowing to the common stockholders. The case as framed is primarily about reallocating rights at the stockholder level, not about recovering consideration at the corporate level. Although in a case challenging a dilutive stock issuance the *Tooley* questions can be answered with "either" or "both," here the case focuses primarily on injury at the stockholder level and seeks a remedy that will operate at the stockholder level. The claims against the Series D and E Financings are therefore direct.

### b. The Challenges To The MIP

▪▪▪▪ A claim alleging diversion of merger consideration is another cause of action that can be individual or derivative. In *Kramer v. Western Pacific Industries, Inc.*, 546 A.2d 348 (Del.1988), the complaint alleged that two of the target corporation's twelve directors breached their fiduciary duties by "diverting to themselves eleven million dollars of the [merger] proceeds through their receipt of stock options and golden parachutes and [by] incurring eighteen million dollars of excessive or unnecessary fees and expenses in connection with the [merger]." *Id.* at 350. The complaint did not allege that the diversion of proceeds rendered the merger price unfair or resulted from an unfair process. The Delaware Supreme Court held that the allegations stated a derivative claim. *Id.* at 354; *accord Lewis v. Anderson*, 477 A.2d 1040, 1042 (Del.1984) (deeming claims against the corporation for issuing golden parachute agreements derivative).

In *Parnes v. Bally Entertainment Corp.*, 722 A.2d 1243 (Del.1999), the complaint alleged that the Chairman and CEO of the target corporation insisted that any acquirer "would be required to pay [him] substantial sums of money and transfer to him valuable [target company] assets," despite lacking any legal authority to demand the payments or asset transfers. *Id.* at 1245. The amount of the side payments was sufficiently large to support a pleadings stage inference that the transactions undermined the fairness of the merger price. *Id.* at 1247. In addition, the complaint alleged that the Chairman and CEO's insistence on the side payments caused some potential acquirers to decline to bid for the company, thereby supporting a pleadings stage inference that the merger process was tainted to a degree that could have undermined the price. *Id.* at 1246. The Delaware Supreme Court concluded that the complaint "directly challenges the . . . merger." *Id.*

---

13. The defendant directors stood on both sides of the merger, were treated differently from other common stockholders, and therefore were interested. *See id.* at *13. Similarly in this case, the complaint has pled facts calling for entire fairness review because of director interest, not because of *Lynch*. It is not clear to me that pleading a "control group" for purposes of standing under *Gentile* necessarily implicates *Lynch*.

In *Golaine v. Edwards*, 1999 WL 1271882 (Del.Ch. Dec. 21, 1999), then-Vice Chancellor Strine thoroughly analyzed *Kramer, Parnes*, and their implications for challenges to side-payments in mergers. Chancellor Strine held that under *Kramer* and *Parnes*, a plaintiff only can state an individual claim if the complaint pleads that the side payments gave rise to a pleadings stage inference that the merger consideration was unfair: "[I]f plaintiffs fail to allege facts that convince the court that the side transactions rendered the underlying transaction unfair to the target's stockholders and instead simply allege that the acquiror's cost of acquisition was made higher, the plaintiffs fail to state an individual claim." *Golaine*, 1999 WL 1271882, at *5 (footnote omitted). Chancellor Strine later reiterated this point:

> [C]onsider what *Parnes* says about price. As I read that case, it says that if the side transactions were not so costly that they enable the plaintiffs to allege that the consideration offered to the target stockholders was reduced to an unfair level, then a price attack on them must be labeled as derivative and extinguishable by the merger. If the side transactions are alleged to have reduced the consideration offered to the target stockholders to a level that is unfair, then an attack is labeled as individual because it goes directly to the fairness of the merger.

*Id.* at *6; *see also Penn Mart Realty Co. v. Perelman*, 1987 WL 10018, at *1 (Del.

Ch. Apr. 15, 1987) (dismissing post-closing challenge to severance payments and fees paid to losing bidder for lack of derivative standing where "[s]ignificantly . . . plaintiff did not challenge the fairness of the mergers"); *Bershad v. Hartz*, 1987 WL 6092, at *3 (Del.Ch. Jan. 29, 1987) (noting that for challenge to golden parachutes to assert a direct claim, "the alleged breach must go directly to the fairness of the merger, and plaintiff must be directly attacking the merger"). Other Delaware decisions have applied this rule as a practical matter by holding that plaintiffs stated litigable, individual claims when challenging transactions in which the defendant fiduciaries allegedly diverted a material portion of merger proceeds, either through side-payments or by receiving disparate consideration.[17]

There is a minor disagreement in the case law about whether a complaint could state an individual claim by contending that the *merger process* was unfair because of side payments that were not themselves large enough to divert a material portion of the merger proceeds. In *Golaine*, Chancellor Strine discussed the following hypothetical:

> For example, make the unlikely assumption that a CEO was told that the acquiror would pay another $10 million for the target company shares and that he reacted by agreeing in general terms but asking that $2 million of that sum be diverted to enhancing golden parachutes

---

17. *See, e.g., In re LNR Prop. Corp. S'holders Litig.*, 896 A.2d 169, 178 (Del.Ch.2005) (denying motion to dismiss claim challenging merger in which *controlling stockholder sold to third party but received right to roll equity in transaction*); *Jackson Nat. Life Ins. Co. v. Kennedy*, 741 A.2d 377, 392 (Del.Ch.1999) (denying motion to dismiss claim that acquirer aided and abetted alleged breach of duty by officer and controlling stockholder in diverting $12 million of transaction proceeds to

himself and his entity); *In re USACafes, L.P. Litig.*, 600 A.2d 43, 46–48 (Del.Ch.1991) (denying motion to dismiss claim that target entity fiduciaries diverted $15 to $17 million of transaction proceeds to themselves); *Chaffin v. GNI Grp., Inc.*, 1999 WL 721569, at *7–8 (Del.Ch. Sept. 3, 1999) (holding complaint stated individual claims where insiders were allowed to roll equity into the post-merger company in addition to receiving other benefits).

for him and his fellow managers. Further assume that the total consideration ultimately offered to the target stockholders was fair but would have been $2 million higher had the CEO not traded for himself and his fellow officers. *It is probable that Parnes* contemplates that the $2 million payment could be attacked individually as unfair dealing that tainted the final merger terms. *But it is also possible to read Parnes* as indicating that a plaintiff must allege that the process violations were so severe as to reduce the merger consideration to an unfair level before the claim will cross the threshold from derivative to individual.

1999 WL 1271882, at *6 (emphases added) (footnotes omitted). *Golaine* posited that, regardless of the process allegations, a complaint could state an individual claim only if it alleged that the side payments rendered the merger price unfair.

In *In re Ply Gem Industries, Inc. Shareholders Litigation,* 2001 WL 755133 (Del.Ch. June 26, 2001), Vice Chancellor Noble disagreed and held that the disjunctive standard in *Parnes* necessarily contemplates a challenge to a merger based on an unfair process. *Id.* at *5. After quoting the *Golaine* hypothetical, Vice Chancellor Noble stated:

> The *Golaine* Court's conclusion was that, in these hypothetical circumstances, it was probable that under *Parnes* the $2 million payment could be attacked individually as the product of unfair dealing that tainted the final merger terms. The issue became whether an individual claim could exist only if the process were so unfair as to have resulted in an unfair price, or whether an individual claim could exist where the unfair process resulted in a less than the best reasonably available, but not unfair, price. *Parnes* makes

clear that the test is whether the alleged breaches of fiduciary duties resulted in unfair price *and/or* unfair process. Thus, given the disjunctive nature of the standard, it is difficult to imprint an unfair price concept on the process side of the *Parnes* evaluation. As *Golaine* frames it, "the real question underlying the teaching of *Parnes* [is] whether the Complaint states a claim that the side transactions caused legally compensable harm to the target's stockholders by improperly diverting consideration from them to their fiduciaries."

*Id.* (footnotes omitted); *see also id.* at *6 ("[B]y putting fairly before the Court the contention that they are challenging the fairness of the merger price or the merger process, Plaintiffs can survive the derivative-individual obstacle...."); *Chaffin,* 1999 WL 721569, at *7–8 (Del.Ch. Sept. 3, 1999) (finding that plaintiffs challenged the process and price and thus set forth a direct claim, not a derivative claim). I need not attempt to resolve this dispute because under *Golaine*'s more restrictive view, the MIP diverted a sufficient quantum of merger proceeds to support an inference that the consideration was unfair to the holders of common stock.

The *Parnes/Golaine* approach rests on straightforward expectations. First, it can be inferred reasonably at the pleadings stage that the buyer is paying a total amount to acquire the entity. It is therefore

> unlikely that the acquiror cares all that much about how its total costs were allocated. If the target board wishes to increase payments to insiders in order to allocate more of the total acquisition cost to them rather than the public stockholders, the acquiror will [most] likely be indifferent, unless the allocation is proposed so crassly or is so disparate as to raise the specter of meritori-

ous stockholder suits attacking the merger.

*Golaine,* 1999 WL 1271882, at *6.

Second, it can be inferred reasonably at the pleadings stage that the buyer is paying to acquire the target company's business and not for the right to sue the target company's fiduciaries. Acquirers buy businesses, not claims. Merger-related financial analyses focus on the business, not on fiduciary duty litigation. "Depending on the circumstances, the new acquiror may be barred from causing the target corporation itself to [sue its former fiduciaries] under basic contract law or ... the [*Bangor Punta Operations v. Bangor & A. R. Co.,* 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974)] doctrine...." *Golaine,* 1999 WL 1271882, at *4 n. 16. In *Bershad v. Hartz,* the acquirer agreed in the merger agreement not to challenge golden parachutes issued by the target corporation in anticipation of the merger. *Bershad,* 1987 WL 6092, at *3.

Even if the acquirer can sue, that decision has financial ramifications. If successful in their defense, whether on the merits or otherwise, the directors and officers of the acquired entity would be entitled to mandatory indemnification. *See* 8 *Del. C.* § 145(c). Typically, they will have the right to mandatory advancement. *See Homestore, Inc. v. Tafeen,* 888 A.2d 204, 212 (Del.2005) ("[M]andatory advancement provisions are set forth in a great many corporate charters, bylaws and indemnification agreements." (footnote omitted)). They may have bargained for direct contractual indemnification and advancement from the new parent corporation. *See, e.g., La. Mun. Police Emps.' Ret. Sys. v. Crawford,* 918 A.2d 1172, 1178–80 (Del.Ch. 2007) (noting arm's length, third party merger agreement provided significant protections for directors and officers of acquired company who were defendants in

then-pending derivative actions, including direct contractual indemnification from the acquirer). An acquirer would fund the litigation for both sides, subject only to the right to recover amounts advanced *if* the company obtained a judgment *and* the Court of Chancery determined that indemnification should not otherwise be available. *See* 8 *Del. C.* § 145(b).

Human dynamics enter the picture. The acquiring company has just purchased the target company in a process run by the same directors and officers who the acquiring corporation would be suing. Would the deal have happened if the directors and officers thought they would face a suit from the buyer? For companies who regularly make acquisitions, a reputation for pursuing claims against sell-side fiduciaries would not help their business model. Moreover, directors of the acquired corporation may join the combined entity's board, and senior officers of the acquired company may become part of the ongoing management team. Those individuals would become defendants in the acquirer's lawsuit.

Consequently, "[w]hile the courts may indulge the notion that the claims still 'survive' ... they usually die as a matter of fact." *Golaine,* 1999 WL 1271882, at *5; *accord Penn Mart,* 1987 WL 10018, at *2 ("I agree that it is highly unlikely that Pantry Pride, which now controls Revlon, will seek to redress the allegedly excessive severance payments or allegedly excessive fees and therefore these abuses (if they are abuses) are not likely to be addressed."). Together, these expectations support a reasonable pleadings stage inference that side payments reduce the total merger consideration and that the merger consideration does not provide compensation for a transfer of the legal right to challenge the payments. Having been deprived of a material portion of the merger

consideration, the stockholders have an individual right to sue.

The *Parnes* and *Golaine* principles dictate that the challenge to the MIP states an individual claim. The MIP diverted $15 million to management, representing 18.87% of the total merger consideration and more than *three times* the total consideration available after the liquidation preferences. That amount is facially material, and the plaintiffs have adequately pled that the puny payments they received were unfair. In response, the defendants contend that even if the MIP were invalidated, the preferred stock's participation rights would mean that only an immaterial fraction of additional consideration would fall to the common. That position assumes that the plaintiffs do not succeed on any of their claims to (i) invalidate some or all of the Series D and E Preferred and (ii) remedy the failure to adjust the conversion prices. The plaintiffs are entitled to an inference that the MIP diverted a material amount of consideration, giving them standing to sue individually.

## III. CONCLUSION

To state the obvious, the denial of the motions to dismiss does not mean that the plaintiffs will prevail. Many of the actions described in the complaint could be consistent with efforts by properly motivated venture capitalists seeking to increase firm value.

For example, the complaint alleges that the initial step in the scheme was dismissing Carsanaro. Venture capitalists frequently replace the founder-CEO.[18] It is self-evident that such a decision could be appropriate. But it is also true that a founder-CEO may have greater incentive and ability to resist strategies that favor the holders of preferred stock (the venture capitalists) over the holders of common stock (the founders and employees). *See, e.g., Carrots & Sticks, supra* note 18, at 10–11, 23, 27. When the complaint is read as a whole, it is reasonably conceivable that the defendants removed Carsanaro as part of an expropriating scheme. The same favorable inference will not be required at a later stage of the case.

Another example is the complaint's challenges to the terms of the Series D and E Preferred. Later financing rounds typically provide investors with greater cash flow and control rights,[19] and over the course of multiple rounds, venture capitalists often achieve control at the board and stockholder levels.[20] One study notes that while inside rounds can be unfairly dilu-

**18.** *See* Brian J. Broughman & Jesse M. Fried, *Carrots & Sticks: How VCs Induce Entrepreneurial Teams to Sell Startups* (February 19, 2013), *available at* http://ssrn.com/abstract=2221033 (discussing reasons for CEO replacement) [hereinafter *Carrots & Sticks* ]; Jesse M. Fried & Mira Ganor, *Agency Costs of Venture Capitalist Control in Startups*, 81 N.Y.U. L.Rev. 967, 990 (2006) ("VCs eventually end up replacing most founders.") [hereinafter *Agency Costs* ]; Josh Lerner, *Venture Capitalists and the Oversight of Private Firms*, 50 J. Fin. 301, 309–12 (1995) (studying the relationship between CEO replacement and VC board membership).

**19.** *See, e.g.,* Brian Broughman & Jesse Fried, *Renegotiation of Cash Flow Rights in the Sale*

*of VC–Backed Firms*, 95 J. Fin. Econ. 384, 388–89 (2010); Steven N. Kaplan & Per Stromberg, *Financial Contracting Theory Meets The Real World: An Empirical Analysis of Venture Capital Contracts*, 70 Rev. Econ. Stud. 281, 302 (2003).

**20.** *See* D. Gordon Smith, *The Exit Structure of Venture Capital*, 53 UCLA L.Rev. 315, 329–30 (2005) ("With additional rounds of venture investment . . . voting control would eventually transfer to the venture capitalists, either because the venture capitalists would own a majority of the votes or because the venture capitalists would bargain for additional board seats with each new round of investment."); Josè M. Padilla, *What's Wrong with a Washout? Fiduciary Duties of the Venture Capital-*

tive, on the whole they appear to be used for backstop financing, not to expropriate value.[21] At the pleadings stage, when the complaint is read as a whole, the plaintiffs have stated claims challenging the fairness of the Series D and E Preferred.[22] At a later stage, the outcome could well be different.

Counts II and IV are dismissed. Counts I, III, and VII are dismissed as to Bloodhound. The motions to dismiss are otherwise denied. **IT IS SO ORDERED.**

---

ist *Investor in a Washout Financing*, 1 Hous. Bus. & Tax L.J. 269, 274 (2001) ("As is often the case for companies that engage in several rounds of preferred stock financing, each new round requires the addition of one or more new directors designated by investors, which provides the founders with little option but to give the venture capitalist investors a majority of the board directorships, thereby giving the investors effective control over the enterprise."); *Agency Costs, supra* note 18, at 1002 ("VCs obtain majority voting power in over 60% of venture-backed startups by the second round of VC financing."); Bartlett & Garlitz, *supra*, at 601 (arguing that with a significant board presence, blocking rights, and control over financing, VCs are "in de facto control").

**21.** *See, e.g.*, Brian Broughman & Jesse M. Fried, *Do VCs Use Inside Rounds to Dilute Founders? Some Evidence from Silicon Valley*, 18 J. Corp. Fin. 1104, 1104–20 (2012) [hereinafter *Inside Rounds*].

**22.** *See* Bartlett & Garlitz, *supra*, at 617 (identifying factors that could suggest unfairness); *Inside Rounds, supra* note 21, at 1105 (noting that inside rounds typically were preceded by an unsuccessful search for an outside investor); *id.* at 1112 (citing two examples of problematic inside rounds in which the board did not first seek an outside investor).